**BAE SYSTEMS TECHNOLOGY SOLUTION & SERVICES, INC., Plaintiff,**

v.

**REPUBLIC OF KOREA'S DEFENSE ACQUISITION PROGRAM ADMINISTRATION, et al., Defendants.**

**Case No.: PWG-14-3551**

United States District Court, D. Maryland, Southern Division.

Signed July 19, 2016

---

Ari Scott Meltzer, Gregory M. Williams, Richard W. Smith, Scott A. Felder, Wiley Rein LLP, Washington, DC, for Plaintiff.

Jason Drew Wallach, Richard James Conway, Blank Rome LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

Paul W. Grimm, United States District Judge

Plaintiff BAE Systems Technology Solution & Services, Inc. ("BAE") and Defendant the Republic of Korea's Defense Acquisition Program Administration ("DAPA") entered into a Memorandum of Agreement ("MOA"), in conjunction with a Letter of Agreement between the United States and the Republic of Korea to upgrade the Republic of Korea's F-16 fighter fleet. When the contract between the nations terminated, DAPA felt that BAE had breached the MOA, while BAE felt that it had no ongoing obligation to DAPA. BAE filed suit here, seeking a declaration of the parties' rights under the MOA, and DAPA then filed suit for breach of contract in South Korea. BAE added the Republic of Korea as a defendant and filed a Motion for Preliminary Foreign Anti-Suit Injunction, ECF No. 73. The parties fully briefed the motion, ECF Nos. 73–1, 80, 83, and I held a hearing on July 18, 2016. I granted the motion, enjoining Defendants from taking any further action to prosecute the Korean suit, until I resolve threshold issues of subject matter and personal jurisdiction and the pending motion for summary judgment, or until the parties agree to stay the Korean lawsuit during the time that I take to resolve the jurisdictional issues and summary judgment motion, whichever occurs first. This Memorandum Opinion and Order memorializes that hearing.

### Background

The United States Government hired BAE ... as the lead contractor for an agreement between the U.S. Govern-

ment and ... DAPA[] "under the U.S. Foreign Military Sales ('FMS') Program to upgrade South Korea's existing fleet of F-16 fighter aircraft for approximately $1.7 billion." Second Am. Compl. ¶ 1, ECF No. 22. Before the governments finalized their agreement, BAE entered into a Memorandum of Agreement ("MOA") with DAPA and "provided DAPA with a Letter of Guarantee for Payment of Bid Bond in the amount of $43,250,000" ("Guarantee"), under which BAE agreed "to pay the bond if it failed to take certain actions during the bid phase of the Upgrade Program." *Id.* ¶ 3. According to BAE, "DAPA continued to insist that BAE [ ] renew its Letter of Guarantee," even after the FMS contract was in effect, and BAE complied.[1] *Id.* ¶ 23.

BAE "performed successfully the initial phases of work under the KF-16 Upgrade Program." *Id.* ¶ 1. But then, "the U.S. Government informed South Korea that the overall price of the Upgrade Program could increase by as much as $800 million," *id.* ¶ 2, and the U.S. Air Force "terminated for convenience" BAE's contract, at South Korea's direction to cancel BAE's "selection ... as the KF-16 system integrator for the KF-16 Upgrade Program," *id.* ¶ 4. DAPA now demands payment under the renewed Guarantee, and in BAE's view, "bases its claim for payment not on an alleged violation of the terms of the Guarantee, but on BAE[ ]'s inability to force the U.S. Government to withdraw its proposed price increases." *Id.* ¶ 5. Mem. Op. 1–2, ECF No. 43.

BAE filed this declaratory judgment action against DAPA on November 12, 2014, seeking a declaration of rights under the MOA and Guarantees between it and DAPA. ECF No. 1; *see* Mem. Op. 2. "Primarily, BAE seeks a declaration that the Guarantee and its renewals are 'incompatible with, and invalid under, the Foreign Military Sales Program ... and federal common law of the United States, and ... therefore unenforceable'; alternatively, it seeks a declaration that it 'did not fail to perform any obligations required of it under such Letter(s) of Guarantee.' ". Mem. Op. 2. Plaintiff then amended to name the Republic of Korea as a second defendant. Am. Compl., ECF No. 12. I refer to Defendants together as "South Korea."

In July 2015, the Republic of Korea filed suit in Seoul Central District Court in South Korea, alleging breach of contract. Mem. Op. 2. South Korea then filed a motion to dismiss or, alternatively, to stay this case during the pendency of the Republic of Korea's suit against BAE in South Korea. ECF No. 26. I concluded that venue is proper in this Court, and I declined to exercise my discretion to dismiss this case under *forum non conveniens*, or to stay it. I reasoned, based on the evidence before me at that preliminary stage, that "the MOA's validity is entwined with the FMS Program, which is a matter of national security, such that venue certainly should be in this Court." Mem. Op. 3.

As of Defendants' May 19, 2016 status report, service had not been effected on BAE in the Korean suit, but Defendants had "what they believe to be a correct address for service of process and have been ordered by the Korean court to file information regarding the new address or face dismissal of their complaint." ECF No. 76. Defendants explained that "service of process in the Republic of Korea is handled by the courts." *Id.* As of the July 18, 2016 hearing on Plaintiff's motion for a preliminary injunction, Defendants had indeed provided the address to the Korean court but service still had not been effect-

---

1. I refer to the Guarantee and its renewals collectively as "Guarantees."

ed. Defendants stated in the status report that they "are willing to discuss a stay of the Korean action should the complaint be served prior to the Maryland court's determination of BAE TSS's preliminary injunction or summary judgment motions," but they "cannot agree to delay filing the information requested by the Korean court and risk dismissal of that action." *Id.* At the hearing, Defense counsel clarified that his clients are not willing to stay the Korean action until the final resolution of this case, but he agreed to consult with them to determine whether they are willing to stay it until this Court resolves the threshold jurisdictional and substantive issues that the parties have raised in the briefing on the preliminary injunction and summary judgment motions.

The parties agree that parallel suits in different countries " 'should ordinarily be allowed to proceed simultaneously.' " Defs.' Opp'n 12 (quoting Pl.'s Opp'n to Defs.' Mot. to Dismiss 34 n.54, ECF No. 27 (quoting *China Trade & Devel. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir.1987))). But, noting that " 'federal courts have the power to enjoin persons subject to their jurisdiction from prosecuting foreign suits," Plaintiff now "seeks a preliminary foreign antisuit injunction under Federal Rule of Civil Procedure 65." Pl.'s Mem. 8, 13. Specifically, BAE seeks an injunction of limited duration to allow this Court to resolve the issues raised in the pending summary judgment motion.

## Preliminary Injunction

■ The purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir.2003). As a preliminary injunction is "an extraordinary remedy ... [it] may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

■ The standard for a traditional preliminary injunction is well-settled in the Fourth Circuit. To obtain a preliminary injunction, the plaintiff must "establish that [1] he is likely to succeed on the merits, [2] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] the balance of equities tips in his favor, and [4] an injunction is in the public interest." *Id.* at 20, 129 S.Ct. 365; *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir.2011). Under Rule 65, "[a] preliminary injunction cannot be issued unless all four of these elements are met, and " '[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction." ' " *Williams v. JP Morgan Chase Bank*, No. RDB–16–00312, 2016 WL 509426, at *3 (D.Md. Feb. 4, 2016) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir.1991) (citation omitted)). "[T]he burden placed upon Plaintiffs to state a claim for a preliminary injunction is high." *EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, 71 F.Supp.3d 525, 538 (D.Md.2014); *see Fowler v. Wells Fargo Home Mortgage, Inc.*, No. GJH–15–1084, 2015 WL 2342377, at *2 (D.Md. May 13, 2015) (same).

## Preliminary Foreign Anti-Suit Injunction

■ "The suitability of an anti-suit injunction involves different considerations from the suitability of other preliminary injunctions. An anti-suit injunction, by its nature, will involve detailed analysis of international comity. Often ... the injunction will be defensive in nature." *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 990–91 (9th Cir.2006). And, as

the parties observe, "[t]he Fourth Circuit has not addressed the precise legal standard to be employed in determining whether the issuance of an antisuit injunction is proper." *Umbro Int'l, Inc. v. Japan Prof'l Football League*, No. 97–2366–13, 1997 WL 33378853, at *2 (D.S.C. Oct. 2, 1997); *see* Pl.'s Mem. 13; Defs.' Opp'n 14. To date, the Fourth Circuit has addressed anti-suit injunctions only in the context of concurrent *state* (not foreign) and federal litigation and the Anti-Injunction Act. *See Ackerman v. ExxonMobil Corp.*, 734 F.3d 237, 252, 259 (4th Cir.2013) (Duncan, J., concurring) (noting that "the issuance of an anti-suit injunction is highly discretionary"; majority observed that "whether to enjoin state court proceedings is always discretionary"); *Spencer v. Frontier Ins. Co.*, 290 Fed.Appx. 571, 573 (4th Cir.2008) (acknowledging that an anti-suit injunction issued by a New York state court "remain[ed] in effect" with regard to one party before it) (unpublished); *Denny's, Inc. v. Cake*, 364 F.3d 521, 531 (4th Cir.2004) ("*Temporarily staying a potential state suit before it is filed* so that an antisuit injunction can be considered would seemingly create significantly less friction than allowing a state suit to be commenced, only to enjoin it after it is filed." (emphasis added)).

The parties agree that other circuits have taken two different approaches, which Plaintiff refers to as the "liberal" standard, which favors granting an injunction, and the "conservative" standard, which favors simultaneous litigation in the two fora.[2] Pl.'s Mem. 13; *see* Defs.' Opp'n 14 n.10. Within the Fourth Circuit, the District of South Carolina has observed that a third approach exists, under which " '[t]he equitable circumstances surrounding each request for an injunction must be carefully examined to determine whether ... the injunction is required to prevent an irreparable miscarriage of justice.' " *Custom Polymers PET, LLC v. Gamma Meccanica SpA*, No. 15–04882–MGL, 185 F.Supp.3d 741, 757, 2016 WL 2354599, at *10 (D.S.C. May 3, 2016) (quoting *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C.Cir.1984)). In *Custom Polymers*, the District of South Carolina concluded that, under all three approaches to an anti-suit injunction, it was appropriate to enjoin litigation in Italy. *Id.* at 757-61, 2016 WL 2354599, at *11–14. Similarly, in *Albemarle Corp. v. AstraZeneca UK Ltd.*, No. 08–1085, 2009 WL 902348, at *6 (D.S.C. Mar. 31, 2009), the District of South Carolina concluded that, under the liberal and conservative approaches, enjoining litigation in England

---

**2.** The Fifth and Ninth Circuits have employed the liberal standard, and the Seventh Circuit has "incline[d] toward" it without "mak[ing] a definitive choice," *see Philips Med. Sys. Int'l B.V. v. Bruetman*, 8 F.3d 600, 605 (7th Cir. 1993), while the First, Second, Third, Sixth, Eighth, and D.C. Circuits have employed the conservative standard. *See Umbro*, 1997 WL 33378853, at *2–3 (citing *In re Unterweser Reederei Gmbh*, 428 F.2d 888 (5th Cir.1970), *aff'd on rehearing en banc*, 446 F.2d 907 (1971), *rev'd on other grounds sub nom. Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir.1993); *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 855 (9th Cir.1981); *Canadian Filters (Harwich) Ltd. v. Lear–Siegler, Inc.*, 412 F.2d 577 (1st Cir.1979); *China Trade & Devel. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 36 (2d Cir.1987); *Gau Shan Co. v. Bankers Trust Co.*, 956 F.2d 1349, 1355 (6th Cir.1992); *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 926–27 (D.C.Cir.1984)); *Custom Polymers PET, LLC v. Gamma Meccanica SpA*, No. 15–04882–MGL, 185 F.Supp.3d 741, 756-57, 2016 WL 2354599, at *10 (D.S.C. May 3, 2016) (citing *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 359–60 (8th Cir.2007); *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 161 (3d Cir.2001)).

was appropriate. And, in *Umbro*, 1997 WL 33378853, at *3–4, the District of South Carolina enjoined the parallel litigation in Japan, reasoning that the jurisdiction of the federal court and the state's public policies were threatened by the Japanese action, and an anti-suit injunction was necessary to prevent a miscarriage of justice.

█ Analysis of the propriety of a foreign anti-suit injunction is a three-step process under either of the approaches. First, the court resolves the threshold considerations of whether the parties and issues are the same. Second, the court considers four factors to determine the effect the foreign suit would have if it were to continue. Third, the court considers principles of comity.

### Significance of Concurrent Jurisdiction

█ A country's "prerogative to control and regulate activities within its boundaries," which "is an essential, definitional element of sovereignty," gives rise to jurisdiction. *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 921 (D.C.Cir.1984). The same "principles underlying territorial jurisdiction occasionally permit a state to address conduct causing harmful effects across national borders." *Id.* Thus,

> [t]erritoriality-based jurisdiction ... allows states to regulate the conduct or status of individuals or property physically situated within the territory, even if the effects of the conduct are felt outside the territory. Conversely, conduct outside the territorial boundary which has or is intended to have a substantial effect within the territory may also be regulated by the state.
>
> Just as the locus of the regulated conduct or harm provides a basis of jurisdiction, the identity of the actor may also confer jurisdiction upon a regulating country. The citizenship of an individual or nationality of a corporation has long been a recognized basis which will support the exercise of jurisdiction by a state over persons. Under this head of jurisdiction a state has jurisdiction to prescribe law governing the conduct of its nationals whether the conduct takes place inside or outside the territory of the state.

*Id.* at 921–22 (footnotes omitted). Significantly, "two or more states may have legitimate interests in prescribing governing law over a particular controversy," and therefore "these jurisdictional bases are not mutually exclusive" but rather "often give rise to concurrent jurisdiction." *Id.* at 922.

█ Under these circumstances, "[t]he mere existence of dual grounds of prescriptive jurisdiction does not oust either one of the regulating forums," and "each forum is ordinarily free to proceed to a judgment." *Id.* at 926. This means that "parallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other." *Id.* at 926–27. Thus, "[t]he mere filing of a suit in one forum does not cut off the preexisting right of an independent forum to regulate matters subject to its prescriptive jurisdiction. For this reason, *injunctions restraining litigants from proceeding in courts of independent countries are rarely issued.*" *Id.* at 927 (emphasis added). Additionally, anti-suit injunctions "effectively restrict the foreign court's ability to exercise its jurisdiction," and therefore courts have the discretion to enjoin foreign suits, rather than allowing them to proceed concurrently, "only in the most compelling circumstances." *Id.*

### Threshold Considerations

█ The anti-suit injunctions factors are similar under both approaches. Prelim-

inarily, the court considers whether "(1) 'the parties are the same in both [the foreign and domestic lawsuits],'" and whether "(2) 'resolution of the case before the enjoining court is dispositive of the action to be enjoined.'" *Canon Latin Am., Inc. v. Lantech (CR), S.A.*, 508 F.3d 597, 601 (11th Cir.2007) (quoting *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir.2004)); *see E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 991 (9th Cir.2006) (same). This standard also has been stated as "whether parallel suits involve the same parties and issues." *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 18 (1st Cir.2004) (same). Courts taking both liberal and conservative approaches have considered substantial similarity, instead of looking only for whether the parties and claims were identical or whether the case in the enjoining court is dispositive of the other case. *See Paramedics*, 369 F.3d at 652 (finding "substantial similarity" between the parties to the domestic and foreign litigation, even though one party was only a party to one of the two suits); *Quaak*, 361 F.3d at 20 (finding that "parties and issues [that] are substantially similar ... satisfy[ ] the gatekeeping inquiry"); *E. & J. Gallo Winery*, 446 F.3d at 991 (finding standard met where, even though the "cases arose from different acts[,] ... all the issues before the court in the Ecuador action [were] before the court in the California action"); *see also Canon Latin Am., Inc.*, 508 F.3d at 601 (concluding that claims were not "sufficiently similar" where federal district court judgment could not resolve "statutory rights that are unique to Costa Rica").

discussed this assessment agree that the court should consider the following four factors: "whether the parallel litigation would '(1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; [or] (4) prejudice other equitable considerations ....'" *Software AG, Inc. v. Consist Software Sols., Inc.*, 323 Fed.Appx. 11, 12 (2d Cir.2009) (quoting *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 119 (2d Cir.2007) (alterations, ellipses, and internal quotation marks omitted)); *see In re Unterweser Reederei Gmbh*, 428 F.2d 888, 896 (5th Cir.1970), *aff'd on rehearing en banc*, 446 F.2d 907 (1971), *rev'd on other grounds sub nom. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (stating factor (2) as "be vexatious or oppressive"); *E. & J. Gallo Winery*, 446 F.3d at 989–90 (9th Cir.) (applying standard from *Unterweser*); *Gau Shan Co. v. Bankers Trust Co.*, 956 F.2d 1349, 1355 (6th Cir.1992) (adopting Second Circuit's approach but stating factors simply as whether "the foreign proceeding 1) threatens the jurisdiction of the United States court, or 2) evades strong public policies of the United States"). Notably, "[t]he language ... is disjunctive: if any of the ... elements is present, an anti-suit injunction may be proper." *Id.* The Second Circuit also considers a fifth factor— whether allowing the foreign suit to proceed would "'result in delay, inconvenience, expense, inconsistency, or a race to judgment.'" *Software AG*, 323 Fed.Appx. at 12 (2d Cir.) (quoting *Karaha Bodas Co.*, 500 F.3d at 119 (2d Cir.)).

### Anti-Suit Injunction Factors

■ If the answer to these preliminary inquiries is "yes," the court assesses the effect of the foreign suit, if it were to proceed. The Courts of Appeals that have

### Comity

■ If the preliminary and secondary factors are satisfied, the court must consider principles of comity. *See O'Keefe v. Chisholm*, 769 F.3d 936, 937 (7th Cir.2014),

*cert. denied,* —— U.S. ——, 135 S.Ct. 2311, 191 L.Ed.2d 1000 (2015) ("[P]rinciples of 'equity, comity, and federalism' determine whether [anti-suit injunctions] are appropriate."); *Paramedics,* 369 F.3d at 654–55 ("Principles of comity weigh heavily in the decision to impose a foreign anti-suit injunction."); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 335 F.3d 357, 366 (5th Cir. 2003) ("When a preliminary injunction takes the form of a foreign antisuit injunction, we are required to balance domestic judicial interests against concerns of international comity."); *see also E. & J. Gallo Winery,* 446 F.3d at 991 (stating that "the impact on comity" must be "tolerable"). This is because even though an "injunction operates only against the parties, and not directly against the foreign court, ... such an order effectively restricts the jurisdiction of the court of a foreign sovereign." *China Trade & Dev. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 35 (2d Cir.1987) (citing *Peck v. Jenness,* 48 U.S. (7 How.) 612, 625, 12 L.Ed. 841 (1849); *United States v. Davis,* 767 F.2d 1025, 1038 (2d Cir.1985)). Because of this effect, "an anti-foreign-suit injunction should be 'used sparingly', *U.S. v. Davis,* 767 F.2d at 1038, and should be granted 'only with care and great restraint.' *Canadian Filters (Harwich) v. Lear–Siegler,* 412 F.2d 577, 578 (1st Cir. 1969)." *China Trade,* 837 F.2d at 36 (citing *Laker Airways,* 731 F.2d at 927; *Compagnie Des Bauxites De Guinea v. Ins. Co. of N. Am.,* 651 F.2d 877, 887 (3rd Cir.1981)); *see E. & J. Gallo Winery,* 446 F.3d at 989 ("[T]he power to enjoin [the parties] from proceeding with an action in the courts of a foreign country ... should be used sparingly.").

### Contrasting the Approaches

The parties agree that the main difference in the approaches is that the conservative approach "accords greater weight to comity concerns." Pl.'s Mem. 13; *see* Defs.' Opp'n 14 n.10. Under the liberal approach, the standard does not "exclude[ ] the consideration of principles of comity," but it also does not "require a district court to genuflect before a vague and omnipotent notion of comity every time that it must decide whether to enjoin a foreign action." *Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 627 (5th Cir.1996).

According to the Seventh Circuit in *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.,* "[t]he difference between the two lines of case[s] has to do with the inferences to be drawn in the absence of information." 10 F.3d 425, 431 (7th Cir.1993). The "strict" (or conservative) cases favoring simultaneous litigation "presume a threat to international comity whenever an injunction is sought against litigation in a foreign court." *Id.* In contrast, the "lax" (or liberal) cases favoring injunctions, while not "deny[ing] that comity could be impaired by such an injunction[,] ... demand evidence (in a loose sense—it needn't be evidence admissible under the Federal Rules of Evidence) that comity is likely to be impaired" by an injunction. *Id.* The evidence needed is "some indication" from the opponent that "the issuance of an injunction really would throw a monkey wrench, however small, into the foreign relations of the United States." *Id.*

Additionally, under the liberal approach favoring injunctions, the plaintiff "need not meet [the] usual test of a likelihood of success on the merits of the underlying claim to obtain an antisuit injunction against [the defendant] to halt the [foreign] proceedings," but rather "need only demonstrate that the factors specific to an anti-suit injunction weigh in favor of granting the injunction." *E. & J. Gallo Winery,* 446 F.3d at 991 (9th Cir.); *see Karaha,* 335 F.3d at 364 (5th Cir.) ("Although both the district court and the parties discussed all four prerequisites to the issuance of a tra-

ditional preliminary injunction, the suitability of [a foreign anti-suit injunction] ultimately depends on considerations unique to antisuit injunctions."). In contrast, at least one circuit employing the conservative approach favoring simultaneous proceedings has held that "[a] preliminary anti-suit injunction may be entered only if the multi-factor test [specific to antisuit injunctions] and the ordinary test for a preliminary injunction are both satisfied." *Software AG*, 323 Fed.Appx. at 12 (2d Cir.). In an abundance of caution, I will address the standard preliminary injunction factors as well, although it seems to me that the better-reasoned approach is that the factors unique to whether to grant a preliminary foreign anti-suit injunction are sufficient in and of themselves.

## Discussion

### A. Are the parties and the issues the same or substantially similar?

 In the United States, BAE sued DAPA and then added the Republic of Korea as a defendant. The plaintiff in the suit in South Korea is "Republic of Korea; Statutory Representative: Minister of Justice of the Republic of Korea," and BAE is the defendant. Korean Compl. 1, ECF No. 40-23.[3] BAE argues that "DAPA is an arm of the ROK [Republic of Korea] and acts on its behalf in this matter" and that Defendants conceded that they are " 'substantially' the same" when they argued in their Reply to its Motion to Dismiss that the "Korean case is a parallel proceeding to this case because it involves the same parties and the same issues . . . ." Defs.' Reply to Mot. to Dismiss 26, ECF No. 34-1. As for the issues, in the Korean suit, the Republic of Korea claims that BAE violated its contractual obligations to DAPA. Korean Compl. 2–3; Mem. Op. 2. Here, BAE seeks a declaration that the Guaran-

tee is "incompatible with, and invalid under, the Foreign Military Sales Program . . . and federal common law of the United States, and . . . therefore unenforceable." Second Am. Compl. ¶ 5, ECF No. 22; *see* Mem. Op. 26. If the Guarantee is unenforceable, then DAPA cannot recover for breach of contract. Thus, "[s]uch a declaration would terminate the controversy and moot the litigation now pending in South Korea," and it "could obviate the need for additional litigation in South Korea, unless this Court concluded that BAE breached a valid contract." Mem. Op. 26.

South Korea insists that it has *not* conceded that the preliminary factors are satisfied, as "the resolution of this case is not dispositive of the Korean Action" because "it will be up to a Korean Court to determine the preclusive effects of any determination a foreign court makes," but it nonetheless acknowledges that "the parties and issues between this case and the Korean Action may be the same or substantially similar." Defs.' Opp'n 15.

As noted, various courts have found this substantial similarity to be enough. In *E. & J. Gallo Winery*, 446 F.3d at 991, the cases in California and Ecuador "arose from different acts." There, as here, the defendant in the U.S. action sued for breach of contract in the foreign suit, and the plaintiff in the U.S. action "sought, among other things, a declaration that [it] did not breach the distributorship agreement." *Id.* The court concluded that "all the issues before the court in the Ecuador action are before the court in the California action." In *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, the U.S. plaintiff sued for securities fraud and a magistrate judge ordered production of "relevant auditing records and associated

---

**3.** To the extent that I reference sealed documents, the portions of those documents refer-

enced are unsealed.

work papers," over the Belgian firm defendant's objections based on Belgian law. 361 F.3d 11, 14 (1st Cir.2004). The Belgian firm then filed suit in Belgium, seeking the imposition of penalties "on those who might 'take any step of a procedural or other nature in order to proceed with the discovery-procedure.'" *Id.* The First Circuit concluded that "[t]he parties and issues [were] substantially similar, thus satisfying the gatekeeping inquiry." *Id.* at 20. In the oft-cited case *China Trade*, 837 F.2d 33, China Trade entered into an agreement with Korean shipping corporation Ssangyong to import soybeans to the U.S. on the ship the M.V. Choong Yong. *Id.* at 34. When the ship ran aground, China Trade filed suit in the Southern District of New York, "seeking $7,500,000 in damages from Ssangyong for failure to deliver the soybeans." *Id.* The parties proceeded with discovery, and then Ssangyong filed the Korean equivalent of a declaratory judgment action "seek[ing] confirmation that Ssangyong is not liable for China Trade's loss." *Id.* at 35. The Second Circuit agreed that "the parties and the issues of liability are the same." *Id.* at 35–36. Here, I also find that the parties' and issues' substantial similarity is sufficient for this initial consideration. *See id.*; *E. & J. Gallo Winery*, 446 F.3d at 991; *Quaak*, 361 F.3d at 14. Accordingly, the threshold considerations have been met.

## B. Are one or more anti-suit injunction factors present?

### 1. Would the suit in South Korea "frustrate a policy" in this forum?

 When addressing the preliminary matters of venue and *forum non conveniens*, I already concluded that this case is an "exceptional case" that would not have to be dismissed in favor of litigation in South Korea, even if there were a mandatory forum selection clause, because transactions under the FMS program

should be considered here, and that to do otherwise would contravene national security interests. Mem. Op. 21, 22. Indeed, "the FMS Program does not permit the foreign government to sue the domestic contractor, but rather 'requires the intermediation of the United States,' a requirement that 'reflects the national security interests of the United States.'" Mem. Op. 23 (quoting *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 707 (4th Cir.2007)). It is true that "[a]n antisuit injunction is ... appropriate in cases where parties seek to evade important public policies of the forum." *Umbro Int'l, Inc. v. Japan Prof'l Football League*, No. 97–2366–13, 1997 WL 33378853, at *4 (D.S.C. Oct. 2, 1997). Thus, "[a]n impermissible evasion is much more likely to be found when the party attempts to elude compliance with a statute of specific applicability upon which the party seeking an injunction may have relied, and which is designed to effectuate important state policies." *Laker Airways*, 731 F.2d at 931 n. 73.

But, this is a hybrid action of first impression. It is not an action with an existing FMS contract. The FMS contract came into existence after the parties entered into the MOA, and the FMS contract since has been terminated. What is at issue is the MOA, in which BAE agreed to make its best effort to have the FMS contract include the provisions and pricing South Korea wanted; South Korea alleges that BAE failed to do so. The MOA may be wholly divisible from or inextricably intertwined with the FMS contract. In resolving Defendants' Motion to Dismiss, based on the evidence before me at that time, I concluded that the two contracts "were inextricably intertwined." Mem. Op. 23. Pending now is Plaintiff's Motion for Summary Judgment on whether the contracts are divisible, for which the parties have submitted additional evidence. Therefore,

the issue remains unresolved and although the suit in South Korea may implicate security policy, allowing it to proceed would not necessarily contravene the FMS Program. But, if the contracts are indivisible, then national security surely is a sufficient public policy, *see Trimble*, 484 F.3d at 707, to warrant an injunction, as the Korean action would provide an end-run around the FMS Program and its provisions to protect this nation's security interests. Plaintiff only seeks a brief injunction to resolve this issue. *See* Pl.'s Mot. ¶ 5.

I also already concluded, based on the evidence before me on Defendants' motion to dismiss, that the declaration BAE seeks "would serve the interest of efficiency." Mem. Op. 26. Notably, in *Custom Polymers PET, LLC v. Gamma Meccanica SpA*, the District of South Carolina held that " 'allowing simultaneous prosecution of the same action in a foreign forum thousands of miles away would result in inequitable hardship and tend to frustrate and delay the speedy and efficient determination of the cause.' " No. 15–04882–MGL, 185 F.Supp.3d 741, 758, 2016 WL 2354599, at *11 (D.S.C. May 3, 2016) (quoting *In re Unterweser Reederei Gmbh*, 428 F.2d 888, 896 (5th Cir.1970), *aff'd on rehearing en banc*, 446 F.2d 907 (1971), *rev'd on other grounds sub nom. M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)). It stated that, if the foreign action "proceed[ed] concurrently [it] would be an affront to the goal of judicial efficiency," a policy of the Court. *Id.* Yet, the policy of judicial efficiency receives less weight than other factors, as most simultaneous litigation compromises efficiency. *See China Trade*, 837 F.2d at 36.

### 2. Would the suit in South Korea be vexatious or oppressive?

In determining whether proceedings in another forum constitute vexatious or oppressive litigation, we have looked for the presence of several interrelated factors, including (1) "inequitable hardship" resulting from the foreign suit; (2) the foreign suit's ability to "frustrate and delay the speedy and efficient determination of the cause"; and (3) the extent to which the foreign suit is duplicitous of the litigation in the United States.

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 366 (5th Cir.2003) (footnotes omitted). These considerations also resolve the fifth factor that the Second Circuit considers—whether allowing the foreign suit to proceed would " 'result in delay, inconvenience, expense, inconsistency, or a race to judgment.' " *See Software AG*, 323 Fed.Appx. at 12 (2d Cir.). The Second Circuit has cautioned that the factors of " 'vexatiousness' of the parallel proceeding ... and a 'race to judgment' causing additional expense .... are likely to be present whenever parallel actions are proceeding concurrently," such that "an anti-suit injunction grounded on these additional factors alone would tend to undermine the policy that allows parallel proceedings to continue and disfavors anti-suit injunctions." *China Trade*, 837 F.2d at 36. Similarly, the D.C. Circuit observed that vexatiousness and oppressiveness "do not outweigh the important principles of comity that compel deference and mutual respect for concurrent foreign proceedings. Thus, the better rule is that duplication of parties and issues alone is not sufficient to justify issuance of an antisuit injunction." *Laker Airways*, 731 F.2d at 928.

### 3. Would the suit in South Korea threaten this Court's *in rem* or *quasi in rem* jurisdiction?

The Second Circuit has expanded the scope of this factor: "Even in *in personam* proceedings, if a foreign court is not merely proceeding in parallel but is

attempting to carve out exclusive jurisdiction over the action, an injunction may also be necessary to protect the enjoining court's jurisdiction." *China Trade*, 837 F.2d at 36. In *Custom Polymers*, 185 F.Supp.3d 741, 2016 WL 2354599, the U.S. plaintiff entered into a contract with the Italian defendant and its sales representative (who was participating in a joint venture with it) "for the purchase, design, delivery, installation, and servicing of custom equipment for the reprocessing of plastic waste material." *Id.* at 747, 2016 WL 2354599, at *1. Because the equipment did not work properly, Custom did not pay for it in full and worked with the defendant to try to settle the matter. *Id.* at 746-48, 2016 WL 2354599 at *1–2. When they could not resolve their differences, the parties filed suit, Gamma in Italy and Custom in the District of South Carolina one week later, both claiming breach of contract. *Id.* at 747-48, 2016 WL 2354599 at *2. Gamma moved to stay the U.S. action, and Custom moved for an anti-suit injunction. *Id.*

The District of South Carolina stated that "if the foreign action 'was instituted by the foreign defendant[ ] for the sole purpose of terminating the United States claim,' then an anti-suit injunction is necessary to protect the issuing court's jurisdiction." *Id.* at 758-59, 2016 WL 2354599 at *12 (quoting *Laker Airways*, 731 F.2d at 915). The court reasoned that the foreign defendant's motion to stay the action in federal court "demonstrates its desire to terminate the United States claim to further its lawsuit in Italy." *Id.* Here, also, although South Korea states that it has not moved (at this time) for an anti-suit injunction in the Korean court, it has moved to stay this case pending resolution of the South Korean action. ECF No. 26. Its position has been that this case ought not be tried here; it should be tried in Korea instead. In *Custom Polymers*, the court noted that if it did not issue an anti-

suit injunction, "the Italian court could reach a decision on the merits prior to [the SC district court] rendering a decision," after which the SC district court "could ... refuse to act, allowing the Italian court's ruling govern and in essence abstain from properly exercising jurisdiction over the dispute." 185 F.Supp.3d at 759, 2016 WL 2354599, at *12. But, if it chose to exercise its jurisdiction and issue a ruling after the Italian court, if that ruling were contrary to the foreign court's ruling, the parties would have "the Hobson's Choice of trying to act in a singular manner to abide by conflicting rulings." *Id.* The court concluded that, "[g]iven these undesirable alternatives, an anti-suit injunction [was] warranted here to protect [the federal court's] jurisdiction." *Id.* In contrast, in *China Trade*, there was no threat to the court's jurisdiction where "[n]either the Korean court nor Ssangyong ... sought to prevent the southern district from exercising its jurisdiction over th[e] case." 837 F.2d at 37.

Certainly, if the MOA and FMS contracts are indivisible and the Korean action is an attempt to circumvent the regulations of the FMS Program and this Court's authority to enforce them, the Korean action would threaten this Court's jurisdiction. The bigger questions, however, are whether this Court even has jurisdiction for the South Korean action to threaten, and if so, whether the South Korean court has concurrent jurisdiction that it could exercise to threaten this Court's jurisdiction.

### Jurisdiction

In their Opposition (but never before in the assertion of an affirmative defense or in a preliminary motion under Rule 12(b)(1) or (2)), Defendants contend that "[t]he issuance of an antisuit injunction is inappropriate because BAE has failed to demonstrate that the Court has jurisdic-

tion and/or the Act of State Doctrine bars the relief BAE seeks." Defs.' Opp'n 24. Essentially, Defendants argue that this Court lacks both subject matter and personal jurisdiction over them, *see id.* at 6, again advocating for this case to be litigated in Korea rather than here. As noted, Defendants challenged this Court's jurisdiction for the first time in their Opposition to Plaintiff's preliminary injunction motion, *see id.* at 6, 24, after having failed to raise the defense in their motion to dismiss, ECF No. 26, in their answer, ECF No. 47, during any conference calls with the Court, or at any other time during the preceding almost nineteen months of litigation. (Plaintiff filed its Complaint on November 11, 2014; Defendants originally filed their Opposition on June 6, 2016.) But for the somewhat esoteric requirements of the Foreign Sovereign Immunities Act (discussed below), Defendants waived the defense of lack of personal jurisdiction when they omitted it from both their first responsive motion and their responsive pleading. *See* Fed. R. Civ. P. 12(h)(1).

Defendants still have not sought leave to file a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. Regardless, this Court must dismiss if, at any time, it discovers that it lacks subject matter jurisdiction; subject matter jurisdiction cannot be waived. *See* Fed. R. Civ. P. 12(h)(3). I cannot conclude that the South Korean suit would threaten this Court's jurisdiction without finding that this Court has jurisdiction in the first place, and that issue has not been fully briefed, let alone resolved.

In opposing Defendants' jurisdictional challenge, BAE has presented colorable arguments supported by case law that demonstrates a likelihood of subject matter jurisdiction in this Court. This showing is sufficient to justify a brief injunction to afford Defendants the opportunity to respond to BAE's arguments and BAE to reply (as it is its burden to establish subject matter jurisdiction) and to permit this Court to resolve the jurisdictional issue. BAE argues that (1) "DAPA engaged in purely commercial activities," which are an exception to a foreign country's immunity from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(2), and "DAPA has waived its sovereign immunity by agreeing that U.S. law governs the KF-16 Upgrade Program," Pl.'s Reply 10, 13; (2) "[t]he Act of State Doctrine is inapplicable," *id.* at 14; and (3) "DAPA additionally waived its immunity by asserting counterclaims without expressly challenging the Court's jurisdiction," *id.* at 13 n. 10.

### FSIA

■■■ The FSIA is "[t]he only source of subject matter jurisdiction over a foreign sovereign or its instrumentalities in the courts of the United States. *Blue Ridge Investments, L.L.C. v. Republic of Argentina,* 735 F.3d 72, 83 (2d Cir.2013). It "provides that foreign states 'shall be immune' from the jurisdiction of U.S. courts except as provided in certain specified exceptions," including "waiver, commercial activity, takings of property in violation of international law, and noncommercial torts." Curtis A. Bradley, *International Law in the U.S. Legal System* 233 (Oxford 2013) ("*International Law*") (quoting 28 U.S.C. §§ 1604–1605). "[O]nce a defendant 'presents a prima facie case that it is a foreign sovereign . . ., the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign.'" *Blue Ridge Investments,* 735 F.3d at 83 (quoting *In re Terrorist Attacks on September 11, 2001 (Saudi Joint Relief*

*Comm., et al.),* 714 F.3d 109, 114 (2d Cir. 2013) (internal quotation marks omitted)).

> The structure of the FSIA is complicated because issues of personal jurisdiction, subject matter jurisdiction, and immunity from suit are intertwined. If proper service is made on a foreign state defendant, personal jurisdiction exists with respect to any claim for which there is federal subject matter jurisdiction. Federal subject matter jurisdiction in turn exists "as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity." Under this structure, a court must determine whether the foreign state defendant is immune from suit in order to determine whether the court has personal and subject matter jurisdiction. If the court finds that the defendant is immune, the court lacks personal and subject matter jurisdiction. Conversely, *if the court finds that there is an exception to immunity, and that proper service has been made, the court automatically has personal and subject matter jurisdiction.*

*International Law* 234 (quoting 28 U.S.C. § 1330(a) (emphasis added)).

Although the FSIA's legislative history suggests that jurisdictional immunity is "an affirmative defense which must be specially pleaded" by the foreign sovereign, H.R. Rep. No. 94–1487, at 17, 1976 U.S.C.C.A.N. 6604, 6616 (1976), the Supreme Court has stated that because § 1330(a) "subject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity, . . . even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the" FSIA, *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 493 n. 20, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). This requirement is consistent with the courts' "independent obligation to con-

sider the presence or absence of subject matter jurisdiction *sua sponte." College Standard Magazine v. Student Ass'n of State Univ. of N.Y. at Albany,* 610 F.3d 33, 35 (2d Cir.2010) (internal quotation marks omitted).

*Walters v. Indus. & Commercial Bank of China, Ltd.,* 651 F.3d 280, 287 (2d Cir. 2011).

### Waiver

A foreign state is not immune from suit under the FSIA "if it 'has waived its immunity either explicitly or by implication.'" Curtis A. Bradley, *International Law in the U.S. Legal System* 237 (Oxford 2013) (quoting 28 U.S.C. § 1605(a)(1)). Explicit waiver occurs, for example, when "a foreign state . . . waive[s] its immunity in a contract with a private party," and "[s]ince the sovereign immunity of a[n] . . . agency or instrumentality of a foreign state derives from the foreign state itself, the foreign state [also] may waive the immunity of its . . . agencies or instrumentalities." H.R. Rep. No. 94-1487, at 18. *E.g., Blue Ridge Investments,* 735 F.3d at 83 (concluding that "Argentina waived its sovereign immunity by becoming a party to the ICSID Convention," the terms of which provided that "'[e]ach Contracting State [would] recognize an award rendered pursuant to th[e] Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State,'" such that "Argentina 'must have contemplated enforcement actions in other [Contracting [S]tates,' including the United States" (citations omitted)). A foreign state that "agrees to a waiver of sovereign immunity in a contract" may withdraw that waiver "only in a manner consistent with the expression of the waiver in the contract," which typically means that a foreign state typically cannot unilaterally

revoke its waiver. H.R. Rep. No. 94-1487, at 18.

 Implicit waiver occurs when a foreign nation "agree[s] to arbitration in another country" or "agree[s] that the law of particular country should govern a contract" or "*file[s] a responsive pleading in an action without raising the defense of foreign sovereign immunity.*" *Id.* (emphasis added). "Courts have found waivers of implied sovereign immunity in [these] three circumstances . . . ." *Human v. Czech Republic–Ministry of Health*, No. 14–7142, 824 F.3d 131, 140, 2016 WL 3064507, at *8 (D.C.Cir. May 31, 2016) (citing *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C.Cir.1990)); *see Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1338 (11th Cir.2015) (recognizing that implied waiver applies under these circumstances); *Af-Cap, Inc. v. Republic of Congo,* 462 F.3d 417, 426 (5th Cir.2006) (same); *World Wide Demil, L.L.C. v. Nammo, A.S.*, 51 Fed.Appx. 403, 405 (4th Cir.2002) (same); *In re Republic of Philippines*, 309 F.3d 1143, 1151 (9th Cir.2002) (same).

Here, South Korea filed an Answer and Counterclaims on February 18, 2016, ECF No. 47, that did not raise personal jurisdiction, subject matter jurisdiction, or immunity, and it did not raise jurisdiction in a separate motion. South Korea then filed an Amended Answer and Counterclaims on March 10, 2016, ECF No. 53, that raised the Act of State Doctrine and "den[ied] that the act upon which BAE TSS bases its claim—Defendants' demand for pay-ment of the amount of the bid bond required by Korean law—falls within the commercial activities exception of the Foreign Sovereign Immunities Act," without explicitly raising lack of subject matter jurisdiction as a defense. Am. Ans. 2.

In addition to a general waiver provision, the FSIA contains an exception to immunity for certain counterclaims. Under this exception, foreign states that bring claims in U.S. courts are denied immunity for any counterclaims that e[i]ther fall within one of the general exceptions to immunity or arise out of the same transaction or occurrence as the foreign state's claim. Moreover, other counterclaims may be asserted against the foreign state "to the extent they do not seek relief exceeding in amount or differing in kind from that sought by the foreign state." *International Law* 238–39 (quoting 28 U.S.C. § 1607). "In general courts have construed the FSIA's implicit waiver exception narrowly, limiting it to situations in which the foreign state defendant has indicated a willingness to be sued in U.S. courts." *International Law* 238.

Section 1607 refers specifically to counterclaims brought against foreign nation *plaintiffs* in U.S. courts.[4] However, the Seventh Circuit has found waiver where foreign nation *defendants* have brought counterclaims in U.S. courts without first raising immunity. *See Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 743–44 (7th Cir.2007) (concluding that defendant, "a company wholly owned

---

**4.** 28 U.S.C. § 1607 states:

In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim—

(a) for which a foreign state would not be entitled to immunity under section 1605 or 1605A of this chapter had such claim been brought in a separate action against the foreign state; or

(b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or

(c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state.

by the Belarusian government" and therefore "an instrumentality of a foreign state,"[5] waived its sovereign immunity implicitly by "[f]ailing to raise sovereign immunity [by answer or motion] and then participating fully in a court proceeding," including by "fil[ing] two counterclaims" for "more than $19 million," and "by agreeing in its original contract with Digital Devices to arbitrate in the United States and by agreeing to a contract governed by Illinois law"); *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.,* 10 F.3d 425, 428, 432 (7th Cir.1993) (concluding that defendant, "a French corporation 90 percent of whose stock is owned by the French state," "waived its objection to the jurisdiction of the Northern District of Illinois when it filed its counterclaim against [plaintiff] in that court without asserting that the court lacked jurisdiction"). Here, Defendants filed counterclaims for breach of contract, fraud, negligent misrepresentation, and promissory estoppel with their Answer and Amended Answer. Countercl. ¶¶ 12–30.

### Concurrent jurisdiction

As for concurrent jurisdiction in the Korean court, I found in my Memorandum Opinion and Order that the forum selection clause of the MOA was not exclusive, thereby implicitly acknowledging that it grants South Korea *in personam* jurisdiction, albeit concurrent, not exclusive. But, this is only true if the MOA is a standalone contract. If the MOA is indivisible from the FMS contract, then, as BAE contends, *see* Pl.'s Mem. 19, there is not concurrent jurisdiction because the Republic of Korea's decision to enter the FMS contract voluntarily relinquished its right to assert jurisdiction in its courts over disputes within the scope of that agreement. *See Sec'y of State for Defence v. Trimble Navigation Ltd.,* 484 F.3d 700, 707 (4th Cir.2007). If that is so, then the suit in South Korea potentially threatens the jurisdiction of this Court, as stated above, at least for analysis of the antisuit injunction factors.

Thus, the two factors of "greater significance" in this case: "(A) whether the foreign action threatens the jurisdiction of the enjoining forum, and (B) whether strong public policies of the enjoining forum are threatened by the foreign action," *see China Trade & Devel. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 36 (2d Cir.1987), could weigh strongly in favor of an injunction. But further analysis of two issues—preliminarily, this Court's jurisdiction, and then the divisibility of the contracts, is necessary before I can determine conclusively whether an injunction is warranted. BAE has shown that it is sufficiently likely that resolution of these issues will be in its favor, and a brief injunction would enable the resolution of these issues.[6]

### C. What is the impact on comity?

■ 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights

---

**5.** The FSIA applies to suits against " 'foreign states,' " which include " 'an agency or instrumentality of a foreign state,' " which "is in turn defined to include (among other things) a corporation that has a majority of its shares owned by a foreign state." Curtis A. Bradley, *International Law in the U.S. Legal*

*System* 233–34 (Oxford 2013) (quoting 28 U.S.C. § 1603(a)–(b))).

**6.** As for the fourth factor, Plaintiff does not argue that there are "other equitable considerations." *See Software AG, Inc. v. Consist Software Sols., Inc.,* 323 Fed.Appx. 11, 12 (2d Cir.2009).

of its own citizens, or of other persons who are under the protection of its laws. *Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895). The consideration may carry significant weight: In *China Trade*, the Second Circuit reversed the issuance of an injunction because "[t]he equitable factors relied upon by the district court in granting the anti-suit injunction," i.e., "'vexatiousness' of the parallel proceeding ... and a 'race to judgment,'" were "not sufficient to overcome the restraint and caution required by international comity," and "the Korean litigation pose[d] no threat to the jurisdiction of the district court or to any important public policy of th[e] forum." 837 F.2d at 37.

BAE acknowledges that "[a] foreign anti-suit injunction, even when imposed solely on a private party, operates in practice as a limitation on a foreign country's sovereignty," as it "'effectively restrict[s] the foreign court's ability to exercise its jurisdiction.'" Pl.'s Mem. 17 (quoting *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C.Cir. 1984)). Moreover, a dispute such as this that "implicat[es] public international law or *government litigants*" is more likely to threaten comity than "a private contractual dispute." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 887 (9th Cir.2012) (emphasis added). Indeed, if "'the issuance of an injunction really would throw a monkey wrench, however small, into the foreign relations of the United States,' then comity would presumably weigh quite heavily against an anti-suit injunction." *Id.* (quoting *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir.1993) (Posner, J.)).

Here, Plaintiff added the Republic of Korea—a sovereign foreign government—as a defendant, and it was the Republic of Korea that filed suit in South Korea. Comity concerns, which are least when the party to be enjoined is a private individual, slightly greater when the party is a private company unrelated to a foreign government, and greater when the party is a company wholly or partly owned by a foreign sovereign, are greatest when a foreign sovereign is to be enjoined. See *Microsoft Corp.*, 696 F.3d at 887. Thus, this case presents significant comity issues because, as Defendants noted, a preliminary anti-suit injunction would "impinge not only on the jurisdiction of the Korean Court, but also on the sovereign rights of the ROK to seek enforcement of its own laws within its own courts." Defs.' Opp'n 12; see *Microsoft Corp.*, 696 F.3d at 887; *Laker Airways*, 731 F.2d at 927. And, while Plaintiff asserts that "[n]umerous courts have issued anti-suit injunctions when the foreign suit ran afoul of an arbitration agreement or mandatory forum provision" in "scenarios ... directly analogous to the present circumstances," it has not identified (nor has my research uncovered) any case in which a federal court enjoined a foreign government, rather than a private party, from filing suit in its own courts. See Pl.'s Mem. 19 (citing *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir.2006) ("In a situation like this one, where private parties have previously agreed to litigate their disputes in a certain forum, one party's filing first in a different forum would not implicate comity at all. No public international issue is raised in this case. There is no indication that the government of Ecuador is involved in the litigation. Andina is a *private party* in a contractual dispute with Gallo, another *private party*." (emphasis added)); *Gilbane Federal v. United Infrastructure Projects FZCO*, No. 143254, 2014 WL 4950011, at *4 & n. 1 (N.D.Cal. Sept. 24, 2014) ("These are all *private parties*, the disputes do not concern public international issues, and there is no indication that the governments of Lebanon or Dji-

bouti are involved in any way.... To the extent that any government is involved, it is the United States, as the foreign proceedings against Gilbane appear to be interfering with Gilbane's ability to meet its contractual obligations with the United States Navy." (emphasis added)); *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 648–49, 652–53 (2d Cir.2004) (litigation in United States and Brazil between private companies); *Farrell Lines, Inc. v. Columbus Cello–Poly Corp.*, 32 F.Supp.2d 118, 122, 130 (S.D.N.Y.1997) (litigation in United States and Italy between private companies), *aff'd sub nom. Farrell Lines, Inc. v. Ceres Terminals, Inc.*, 161 F.3d 115 (2d Cir.1998).

*Allendale Mutual*, 10 F.3d 425, which Plaintiff also cites, concerned a defendant that was "practically an arm of the French state," as the defendant's parent company (the parent company in large European computer manufacturer Groupe Bull) was "a French corporation 90 percent of whose stock is owned by the French state." *Id.* at 426, 428. (Notably, the FSIA applies to suits against "'foreign states,'" which include "'an agency or instrumentality of a foreign state,'" which "is in turn defined to include (among other things) a corporation that has a majority of its shares owned by a foreign state." Curtis A. Bradley, *International Law in the U.S. Legal System* 233–34 (Oxford 2013) (quoting 28 U.S.C. § 1603(a)–(b))). In *Allendale Mutual*, the Seventh Circuit reviewed a U.S. district judge's injunction that prohibited the defendants "from litigating a suit on a French insurance policy in a French court." 10 F.3d at 428. It observed that, given the French state's ownership interest, "at first glance the action of an American judge in enjoining [the French litigation] may seem like an extraordinary breach of international comity." *Id.* The Seventh Circuit "la[id] the ownership structure of the defendants on one side,"

however, and "decide[d] the case as if BDS [one defendant] were an entirely private French company" because

> although the French government [was] the majority stockholder in the parent company of Groupe Bull, even BDS [did] not argue that foreign commercial enterprises deserve more solicitude from American judges when they are public rather than private. There [was] no suggestion that French officials [were] mixed up in the alleged [wrongdoing].... BDS ma[de] no claim that the government's role in Groupe Bull [was] more than that of a passive investor.

*Id.* Here, in contrast, the foreign government does not have an ownership interest in a defendant; it *is* a defendant. And, it does assert that it has an active role in the contract at issue.

Plaintiff also cites *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111 (2d Cir. 2007), where the plaintiff "KBC" was "a Cayman Islands limited liability company owned by American power companies and other investors," and the defendant "Pertamina" was "an oil and gas company owned and controlled by the Republic of Indonesia." *Id.* at 113. In that procedurally inapposite case, the parties began their dispute with arbitration proceedings in Switzerland, continued with confirmation of the arbitration award in KBC's favor in a U.S. court and entry of judgment in that court, and included litigation in various nations, initiated by both parties, to enforce or avoid the judgment, respectively. *Id.* at 113–16. Ultimately, Pertamina filed suit in the Cayman Islands, seeking damages to offset the judgment, which Pertamina by then had paid. *Id.* The funds to pay the judgment came from Pertamina's New York bank accounts; the Second Circuit "determined that both Pertamina and the Indonesian government owned some

part of the funds in the accounts; and that KBC was entitled to satisfy its judgment against Pertamina out of the portion of the funds owned by Pertamina." *Id.* at 116. Thus, despite its ownership, it was the company and not its government owner that was liable for the judgment. *See id.*

KBC filed suit in federal court, seeking an anti-suit injunction to bar the Cayman Islands litigation. *Id.* at 117–18. The federal court granted the injunction and Pertamina appealed. *Id.* at 118. Considering the factors from *China Trade*, the Second Circuit observed that "while '[p]rinciples of comity weigh heavily in the decision to impose a foreign anti-suit injunction[,] where one court has already reached a judgment—on the same issues, involving the same parties—considerations of comity have diminished force.'" *Id.* at 120 (quoting *Paramedics*, 369 F.3d at 654–55). In *Karah Bodas Co.*, one court already had reached a judgment, diminishing the force of comity considerations, *see id.* at 113–16, 127, which is not true in the case before me. Additionally, the court in the Cayman Islands that KBC sought to enjoin "ha[d] no arguable basis for jurisdiction to adjudicate rights and obligations of the parties with respect to the Award." *Id.* at 125. Therefore, under the arbitration regime through which the parties initiated their dispute resolution, comity concerns weighed in favor of an anti-suit injunction with regard to the Cayman Islands litigation, rather than against it. *See id.* ("'[C]oncerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce ... agreement[s]' to submit disputes to binding international arbitration. These considerations also require us to protect the regime established by the Convention for enforcement of international arbitral awards, if necessary by enjoining parties

from engaging in foreign litigation that would undermine it." (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 629, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).

▆▆ I am troubled by the lack of any prior case in which a federal court has enjoined a foreign sovereign. And, South Korea is a valued ally of the United States and I have the utmost respect for its sovereignty. Yet, even without prior case law in which a federal court enjoined another sovereign nation,

> there are limitations to the application of comity. When the foreign act is inherently inconsistent with the policies underlying comity, domestic recognition could tend either to legitimize the aberration or to encourage retaliation, undercutting the realization of the goals served by comity. No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum. Thus, from the earliest times, authorities have recognized that the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act.

*Laker Airways*, 731 F.2d at 937; *see Canadian Filters (Harwich) Ltd. v. Lear–Siegler, Inc.*, 412 F.2d 577, 578–79 (1st Cir. 1969) (noting that "comity, a blend of courtesy and expedience,[ ] must give way, ... when the forum seeks to enforce its own substantial interests, or in limited circumstances when relitigation would cover exactly the same points," but concluding that "these exceptions do not apply to this case where the subject matter of the foreign suit is a separate, independent foreign patent right").

If resolution of the jurisdictional issue reveals that this Court has subject matter jurisdiction and resolution of the relationship between the contracts establishes that

the two are inextricably intertwined, then these would be the circumstances in which "the obligation of comity expires." *See Laker,* 731 F.2d at 937. Under that scenario, given that the FMS Program, in which South Korea voluntarily chose to participate, "does not permit the foreign government to sue the domestic contractor, but rather 'requires the intermediation of the United States,'" Mem. Op. 23, it would appear that Korea has waived concurrent jurisdiction in its courts by contracting under the FMS Program. Then, an action in that court would not only be lacking in jurisdiction but also be a threat to this Court's jurisdiction. Moreover, because of the interrelationship between the MOA and the FMS contract, the dispute would implicate national security interests in the FMS Program. Mem. Op. 21, 22. And, insofar as both courts must determine whether there is a valid contract, litigation in South Korea "would cover exactly the same points." *See Canadian Filters,* 412 F.2d at 578–79; Mem. Op. 26.

■ Also, "[t]he order in which the domestic and foreign suits were filed, although not dispositive, may be relevant to this determination depending on the particular circumstances." *Microsoft Corp. v. Motorola, Inc.,* 696 F.3d 872, 887 (9th Cir. 2012). Here, this suit was filed eight months before the Korean suit.

■ Where "two parties have made a prior contractual commitment to litigate disputes in a particular forum, upholding that commitment by enjoining litigation in some other forum is unlikely to implicate comity concerns at all." *Id.* I already concluded that the language of the forum selection clause in the MOA is permissive, not mandatory, such that the parties have not committed *through the MOA* to litigating in a specific forum. Mem. Op. 20. But, again, if the MOA is indivisible from the FMS contract, then South Korea appears to have waived its ability to bring suit in

South Korea, such that "upholding that commitment by enjoining litigation in [the South Korean court] is unlikely to implicate comity concerns at all." *Microsoft,* 696 F.3d at 887.

■ In determining the impact on comity, the Court also considers "[t]he scope of the anti-suit injunction," as "'the sweep of the injunction should be no broader than necessary to avoid the harm on which the injunction is predicated.'" *Id.* (quoting *Laker Airways,* 731 F.2d at 933 n. 81). For example, in *Ibeto Petrochemical Indus. Ltd. v. M/T Beffen,* 475 F.3d 56 (2d Cir.2007), "the Second Circuit remanded to the district court with instructions to modify the injunction into a more tailored order "directed specifically to the parties" and limited in time." *Id.* Here, the injunction sought is narrow: BAE asks that this Court "enjoin Defendants from effecting service or otherwise proceeding in the Korean action pending this Court's resolution of BAE TSS' summary judgment motion," which is ripe as of June 3, 2016. Pl.'s Mot. ¶ 5; *see* ECF Nos. 70, 75, 77 (summary judgment briefing).

### D. Preliminary injunction factors

Insofar as this Court should consider the preliminary injunction factors, *see Software AG, Inc. v. Consist Software Sols., Inc.,* 323 Fed.Appx. 11, 12 (2d Cir.2009), these factors weigh in favor of a brief injunction.

### 1. Plaintiff's likelihood of success on the merits

■ The plaintiff must "clearly demonstrate that he will *likely succeed* on the merits," rather than present a mere "grave or serious question for litigation." *Real Truth About Obama, Inc. v. Fed. Election Comm'n,* 575 F.3d 342, 346–47 (4th Cir. 2009) (emphasis from the original). Only "providing sufficient factual allegations to meet the [Fed. R. Civ. P.] 12(b)(6) stan-

dard of *Twombly* and *Iqbal*" does not meet the rigorous standard required under the *Winter* and *Real Truth* decisions. *Allstate Ins. Co. v. Warns,* No. CCB–11–1846, 2012 WL 681792, at *14 (D.Md.2012). Post-*Real Truth* courts have "declined to issue a preliminary injunction when there are significant factual disputes" in breach of contract cases. *Chattery Int'l, Inc. v. JoLida, Inc.,* No. WDQ–10–2236, 2011 WL 1230822 (D.Md.2011) (citing *Allegro Network LLC v. Reeder,* No. 09–912, 2009 WL 3734288, at *3 (E.D.Va. Nov. 4, 2009) (holding that the parties' conflicting versions of facts key to determining whether a breach of a franchise agreement occurred prevented the plaintiff from making a clear showing of the likelihood of success on the merits)); *see Torres Advanced Enter. Sols. LLC v. Mid–Atl. Professionals Inc.,* No. PWG–12–3679, 2013 WL 531215, at *3 (D.Md. Feb. 8, 2013) ("In the present case, the record highlights multiple unresolved factual disputes. As the resolution of these disputes is central to the determination of a breach of contract claim, Plaintiff is prevented from making a clear showing of a likelihood of success on the merits.").

▉ As discussed previously, Plaintiff has shown that it is likely to establish this Court's jurisdiction. And, as Plaintiff argues, the Court "already determined that a foreign sovereign may not sue a U.S. domestic contractor under the FMS program." Pl.'s Mem. 22; *see* Mem. Op. 23. Although I still must determine whether this Court has jurisdiction and whether the MOA falls under the rubric of the FMS Program, Plaintiff's showing at this early stage of the proceedings weighs this factor in its favor.

## 2. Plaintiff's likelihood of suffering irreparable harm in the absence of preliminary relief

▉ To analyze this element, the court must determine whether (1) the Plaintiffs are suffering actual and imminent harm, not just a mere possibility, and (2) whether that harm is truly irreparable, or whether it can be remedied at a later time with money damages. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir.1991). *See also Sterling Commercial Credit—Mich., LLC v. Phoenix Indus. I, LLC,* 762 F.Supp.2d 8, 14–15 (D.D.C.2011) ("First, the injury must be both certain and great; it must be actual and not theoretical . . . . Second, the injury must be beyond remediation."). The Fourth Circuit finds that "irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551 (4th Cir.1994) (quoting *Danielson v. Local 275,* 479 F.2d 1033, 1037 (2d Cir. 1973)).

▉ The harm to Plaintiff is imminent as the Korean case is moving forward and it appears Plaintiff should be served shortly. Although monetary damages typically do not constitute irreparable harm, a possible judgment of more than $43 million with 20% per annum in post judgment interest is significant nonetheless. Additionally, monetary damages would not be available if the Korean court found in the Republic of Korea's favor and this Court then determined that the foreign judgment had a preclusive effect.

## 3. Whether the balance of equities tips in Plaintiff's favor and whether an injunction is in the public interest

▉ The balance of equities must tip in favor of the movant in order for a preliminary injunction to be granted. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Not only must courts weigh any potential harm to the nonmoving party, but also the chance of harm to any inter-

ested person, as well as any potential harm to the public. *Continental Group Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980) (citing *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 924 (3d Cir. 1974)).

 When an injunction will "adversely affect a public interest ... the court may ... withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312–13, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). In fact, "courts ... should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 312, 102 S.Ct. 1798.

 These two factors weigh in favor of an injunction, as the harm to South Korea during the time it takes to decide the jurisdictional issues and summary judgment motion is minimal at best, and an injunction could help, rather than adversely affect, the public. A declaration of its rights under contract in this Court would not harm South Korea, as it seeks to have its rights determined. A declaration in its favor could enable it to prevail in the Korean litigation; a declaration in Plaintiff's favor would not necessarily be given preclusive effect by the Korean court. Because of the national security concerns, an injunction is in the public interest.

## Conclusion

In sum, while it may be inefficient to proceed with parallel concurrent litigation and while the later-filed Korean suit may appear vexatious, those factors must be weighed against those that receive greater weight—whether this Court's jurisdiction is threatened and public policy, as well as comity. Here it is not clear whether the Court has jurisdiction or whether that jurisdiction is threatened. But BAE has shown sufficiently that it is likely that the Court has jurisdiction, that its jurisdiction is threatened, and that national security interests are implicated, outweighing considerations of comity to justify an injunction of brief duration to enable me to resolve the preliminary matters of jurisdiction and whether the contracts are divisible.

I would prefer to resolve Plaintiff's preliminary injunction motion through an agreement between the parties to stay the action in South Korea if South Korea obtains jurisdiction over BAE, for a limited period of time for me to resolve the threshold issues the parties have raised in this litigation. Because the parties have not reached a stay agreement, I will grant a preliminary anti-suit injunction for a very limited period of time. But I will quash this injunction if they later reach a stay agreement or I determine that I lack jurisdiction.

## ORDER

Accordingly, it is, this <u>19th</u> day of <u>July</u>, <u>2016</u>, hereby ORDERED that

1. Plaintiff's Motion for Preliminary Foreign Anti-Suit Injunction, ECF No. 73, IS GRANTED as follows: Defendants are enjoined from taking any further action to prosecute the Korean action, until either the parties agree (or the Korean court independently elects) to stay the Korean action, or absent that agreement, until the resolution of the threshold issue of subject matter jurisdiction and the pending motion for summary judgment;

2. The parties jointly shall inform the Court by July 22, 2016 of the subject matter jurisdiction briefing schedule

803

for Defendants to respond and Plaintiff, who has the burden, to reply.