**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

E. & J. GALLO WINERY,
        *Plaintiff-Appellant,*

v.

ANDINA LICORES S.A.,
        *Defendant-Appellee.*

No. 05-16504

D.C. No.
CV-05-00101-AWI

OPINION

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, District Judge, Presiding

Argued and Submitted
February 15, 2006—San Francisco, California

Filed May 1, 2006

Before: J. Clifford Wallace, Michael Daly Hawkins, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Wallace

4931

**COUNSEL**

Tod L. Gamlen, Keith L. Wurster, Baker & McKenzie LLP, Palo Alto, California, for appellant E & J Gallo Winery.

Sean T. O'Rourke, Borton Petrini & Conron, Fresno, California, for appellee Andina Licores, S.A.

---

## OPINION

WALLACE, Circuit Judge:

E & J Gallo Winery (Gallo) appeals from the district court's denial of a preliminary injunction to enjoin Andina Licores S.A. (Andina) from proceeding with litigation in Ecuador. We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1). We reverse and remand to the district court with instructions to grant the injunction.

## I

Gallo, a large winery headquartered in Modesto, California, entered into a distributorship agreement with Andina Licores CIA LTDA, a wine and liquor distributor headquartered in Guayaquil, Ecuador, in 1978. The distributor later changed its structure to become a corporation and changed its name to Andina Licores, S.A, the defendant-appellee in this appeal.

In 1987, Gallo and Andina executed an updated distributorship agreement, in which Andina was substituted for its predecessor-in-interest. Both the 1987 Agreement and the 1978 Agreement have the same forum selection and choice-of-law clauses in favor of California:

> This agreement is entered into under the laws of the State of California, U.S.A., and shall be construed thereunder, and any cause of action arising between the parties, whether under this agreement or otherwise, shall be brought only in a court having jurisdiction and venue at the home office of Winery.

In April and May 2004, Gallo and Andina exchanged letters over various disputes, including whether Gallo had delivered three shipments late and whether Andina was an exclusive distributor of Gallo products. In July 2004, Andina appeared before the Sixth Civil Court in Guayaquil in connection with its dispute with Gallo. Although Gallo had identified its Ecuadorian lawyer in an April 19, 2004 letter to Andina, and although Andina and Gallo had been in a contractual relationship for over twenty-five years, Andina represented to the court that it did not know Gallo's whereabouts in Ecuador. For this reason, Andina asked the court to appoint a "curador": a guardian to act as counsel for Gallo and to appear for Gallo in any proceedings that Andina might file. Strangely, Andina was allowed to choose this guardian, and Andina selected Rita Yepez de Maher (Yepez), an attorney who apparently had only been admitted to practice law five months earlier. In support of its application to appoint Yepez as curador, Andina was required to provide affidavits of two people who could swear to Yepez's reliability and could recommend her. Andina submitted the affidavits of a day laborer and a student.

Andina filed suit against Gallo in the Second Civil Court of Guayaquil, Ecuador, on August 11, 2004, alleging a violation of Decree 1038-A, which was issued by the Ecuadorian military dictatorship in 1976 and had been repealed in 1997. The decree was intended to protect Ecuadorians who acted as agents, distributors, or representatives of foreign companies. Article 3 of the Decree maintained that the parties to a distributorship agreement between an Ecuadorian distributor and a foreign manufacturer could not include a unilateral right of termination in the agreement. Additionally, the Decree stated that any legal action brought under the law was to be heard by a judge at the Ecuadorian company's main residence, thus potentially invalidating all forum selection clauses. The Decree also provided for a "verbal summary trial," in which periods for discovery or response were drastically shortened and in which there was no opportunity to examine and cross-

examine witnesses. In the event that a foreign manufacturer violated Article 3, it was liable to the local distributor for damages, which were calculated by multiplying a distributor's annual revenue from the agreement in the most recent fiscal year by the number of years of the distributor relationship. Decree 1038-A was repealed by the National Congress of Ecuador in 1997 by Law No. 22. The preamble to Law No. 22 stated that Decree 1038-A was contrary to the treaty of the World Trade Organization.

Andina sued under the Decree in spite of its revocation several years before. Invoking the Decree's method of damage calculation, Andina claimed $75,000,000 in damages. It also invoked the Decree's verbal summary trial procedures, which required Gallo to appear and assert its defenses before September 9, 2004. The period to submit evidence was limited to six business days: from September 10 to September 17, 2004. The Ecuadorian court was not required to consider any defense or evidence that Gallo did not submit within these time limitations.

The Ecuadorian court officially appointed Yepez as the curador on September 1. Yepez mailed a letter dated September 3 to Gallo in California. The letter, written in Spanish, informed Gallo of the lawsuit in Ecuador, of her appointment as Gallo's lawyer, and of the allegations in the complaint. However, the letter did not include a copy of the complaint and did not make any mention of the expedited trial procedure. Gallo declares that it did not receive the letter until September 16.

Without having made any other contact with Gallo, Yepez made an appearance on behalf of Gallo on September 9. Yepez asserted some defenses on Gallo's behalf but did not assert a defense based on the forum selection clause. Finally, on September 16, Yepez called Gallo's headquarters and informed it of the lawsuit. Gallo called its Quito attorney, whose name had been given to Andina in April, and eventu-

ally retained Xavier Castro to represent it in the Guayaquil action. Castro was unable to inform the Ecuadorian court of the forum selection clause defense before the September 9 deadline, and he did not have time to present any evidence before the close of evidence period.

On October 26, Gallo filed suit in California state court, seeking declaratory relief, injunctive relief, damages, and punitive damages. Although Andina was required by the 1987 Agreement to appoint CT Corporation as its agent for service of process, it had failed to do so; thus, Gallo served Andina in Ecuador. Andina removed the case to the district court. After various motions activity, Andina filed a motion to dismiss for lack of personal jurisdiction. Gallo opposed the motion to dismiss and filed a cross-motion for a preliminary injunction restraining Andina from pursuing the action in Ecuador and issuance of a letter rogatory. That cross-motion is the subject of this appeal.

On June 24, 2005, the district court denied both motions. The district court held that Andina had consented to jurisdiction; therefore, it denied Andina's motion to dismiss. The court also denied Gallo's motion for a preliminary injunction, basing its decision largely on considerations of international comity.

In the meantime, a dizzying array of judgments, appeals, and procedural motions continued in Ecuador. On August 8, 2005, the Second Civil Court dismissed the action in Ecuador, holding that the forum selection clause was valid and that the claim should be heard in California. Additionally, the district court held that Andina had improperly invoked the "curador" procedure. Andina appealed.

On August 10, Andina filed another lawsuit in the 29th Civil Court to disqualify the Second Civil Court. Because of this filing, the underlying action was temporarily removed from the Second Civil Court pending a decision by the 29th

Civil Court. Two weeks later, Andina filed a motion in the 29th Civil Court to annul the Second Civil Court's August 8 decision. This motion was denied on September 15. Five days later, Andina filed another motion before the 29th Civil Court to revoke the order denying the annulment motion. The court denied this motion one week later. Undaunted, on September 29, Andina filed a motion before the 29th Civil Court to annul two Second Civil Court rulings in favor of Gallo. These motions are, apparently, still pending.

On September 26, Andina filed yet another motion in the 29th Civil Court, seeking to interrogate the judge of the Second Civil Court who had ruled in favor of Gallo, Judge Ukles Cornejo Bustos. Eventually, on November 15, 2005, Andina filed a complaint in the Superior Court of Justice of Guayaquil, asserting claims for damages against Judge Bustos. We understand that this motion and complaint are still pending in Ecuador.

## II

The district court's denial of a preliminary injunction is normally reviewed for an abuse of discretion. *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 730 (9th Cir. 1999). However, an anti-suit injunction presents particularly complex legal issues, especially because of international comity concerns. Although our overall review is for an abuse of discretion, "[t]he district court's interpretation of the underlying legal principles . . . is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). "We will reverse a denial of a preliminary injunction where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Sammartano v. First Jud. Dist. Court*, 303 F.3d 959, 964 (9th Cir. 2002).

## A

Courts derive the ability to enter an anti-suit injunction from their equitable powers. Such injunctions allow the court to restrain a party subject to its jurisdiction from proceeding in a foreign court in circumstances that are unjust. The injunction has deep roots in English law. Traceable to at least 15th-century England, it first appeared in the form of a writ of prohibition by the common law courts to the ecclesiastical courts to prevent their expansive jurisdictional assertions. *See* David W. Raack, *A History of Injunctions in England Before 1700*, 61 Ind. L.J. 539, 545-56 (1986). The injunction operates in personam: the American court enjoins the claimant, not the foreign court.

We last examined the standards for issuance of an anti-suit injunction in *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852 (9th Cir. 1981). In *Seattle Totems*, Vincent Abbey and Eldred Barnes, the owners of the Seattle Totems Hockey Club, began a private antitrust action against the National Hockey League and other defendants. Northwest Sports, one of the defendants, brought suit against Abbey and Barnes in British Columbia alleging breach of contract. *Id.* at 853. The district court granted Abbey and Barnes an anti-suit injunction restraining the Canadian proceedings. *Id.*

**[1]** We affirmed. "A federal district court with jurisdiction over the parties has the power to enjoin them from proceeding with an action in the courts of a foreign country, although the power should be used sparingly. The issue is not one of jurisdiction, but one of comity." *Id.* at 855 (internal punctuation and citations omitted). We cited the Fifth Circuit's standard in *In re Unterweser Reederei GmBH*, 428 F.2d 888, 896 (5th Cir. 1970), *aff'd on rehearing en banc*, 446 F.2d 907 (1971), *rev'd on other gds. sub nom. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), as instructive: "foreign litigation may be enjoined when it would (1) frustrate a policy of the forum

issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) where the proceedings prejudice other equitable considerations." *Seattle Totems*, 652 F.2d at 855; *see also Triton Container Int'l Ltd. v. Di Gregorio Navegacao Ltda.*, 440 F.3d 1137, 1138 (9th Cir. 2006) (referring to *Seattle Totems* "factors"). The language from *Unterweser* is disjunctive: if any of the four elements is present, an anti-suit injunction may be proper.

However, *Seattle Totems* did not adopt the *Unterweser* analysis as anything other than instructive. While we referred to two Fifth Circuit cases, it is unclear how much of their analysis we adopted. We considered the "policies and cases" referred to in our opinion, but affirmed the district court's holding based on "equitable balance." *Seattle Totems*, 652 F.2d at 856. Significantly, *Seattle Totems* left many questions unanswered, as it does not elucidate a precise framework for courts to apply when deciding whether to issue an anti-suit injunction. For example, it is silent as to the interplay between the traditional preliminary injunction test and the anti-suit injunction test, and as to the weight to be given to international comity. We now turn to these issues.

**B**

**[2]** "The purpose of a preliminary injunction is to preserve rights pending resolution of the merits of the case by the trial." *Big Country Foods, Inc. v. Bd. of Educ.*, 868 F.2d 1085, 1087 (9th Cir. 1989). A preliminary injunction is appropriate "where plaintiffs demonstrate either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in their favor." *Shelley*, 344 F.3d at 917 (internal quotation marks and citations omitted). "The irreducible minimum . . . is that the moving party demonstrate a fair chance of success on the merits or questions serious enough to require litigation. No chance of suc-

cess at all will not suffice." *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982) (internal punctuation and citations omitted). The degree to which this test is applicable to anti-suit injunctions is unclear, and *Seattle Totems* makes no mention of it. Indeed, *Seattle Totems* may actually have involved a permanent injunction, although it is not clear from the opinion.

**[3]** The suitability of an anti-suit injunction involves different considerations from the suitability of other preliminary injunctions. An anti-suit injunction, by its nature, will involve detailed analysis of international comity. Often, as here, the injunction will be defensive in nature. Gallo has requested the preliminary injunction because of Andina's potentially prejudicial, vexatious and oppressive proceedings in Ecuador. But should Gallo also need to prove a likelihood of success on the merits of the breach of contract claim in order to receive an anti-suit injunction? That is, does our usual test for a preliminary injunction apply, or is a modified analysis required for anti-suit injunctions? While our cases are not clear on this issue, we conclude that the more appropriate approach is that enunciated by the Fifth Circuit: "To the extent the traditional preliminary injunction test is appropriate, . . . we only need address whether [the injunction seeker] showed a significant likelihood of success on the merits. The merits in this case, however, are . . . about . . . whether [the injunction seeker] has demonstrated that the factors specific to an antisuit injunction weigh in favor of granting that injunction here." *Karaha Bodas Co. L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 364 n.19 (5th Cir. 2003).

**[4]** Thus, we hold that Gallo need not meet our usual test of a likelihood of success on the merits of the underlying claim to obtain an anti-suit injunction against Andina to halt the Ecuadorian proceedings. Rather, Gallo need only demonstrate that the factors specific to an anti-suit injunction weigh in favor of granting the injunction. For purposes of this action, we may rely on any of the *Unterweser* factors if it applies to

the case and if the impact on comity is tolerable. This test, we conclude, is consistent with *Seattle Totems*.

## C

**[5]** In applying this test, we believe the first step in determining whether an anti-suit injunction is appropriate is to determine "whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined." *See Sun World, Inc. v. Lizarazu Olivarria*, 804 F. Supp. 1264, 1267 (E.D. Cal. 1992) (citations omitted) (inferring such a test from the discussion in *Seattle Totems*); s*ee also Paramedics Electromedicina Comercial, LTDA v. GE Medical Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004) (using this test); *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 18 (1st Cir. 2004) (same); George A. Bermann, *The Use of Anti-Suit Injunctions in International Litigation*, 28 Colum. J. Transnat'l L. 589, 626 (1990) (stating that courts "will not consider issuing anti-suit injunctions" in the absence of "parallel local and foreign actions between the same parties over the same claim").

**[6]** The district court concluded that the claims were not the same because the California and Ecuador cases arose from different acts. This conclusion was in error. In the Ecuadorian court, Andina sued for breach of contract. In the district court, Gallo sought, among other things, a declaration that Gallo did not breach the distributorship agreement. Therefore, all the issues before the court in the Ecuador action are before the court in the California action.

Andina contends that the claims are not the same because enjoining the Ecuador action would deprive it of its right to pursue its claims under Ecuadorian law. Not so. First, it is not clear that Andina has claims under Ecuadorian law, as the contract contains a choice-of-law clause in favor of California. Second, to the degree that Ecuadorian law does apply,

federal courts are capable of applying it to Andina's claims. *See* Fed. R. Civ. P. 44.1; *see also Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988) (en banc) (holding that "questions of foreign law are not beyond the capacity of our courts").

**[7]** We conclude that the parties and claims are the same.

**D**

**[8]** Turning to another aspect we thought instructive in *Seattle Totems*, "foreign litigation may be enjoined when it would . . . frustrate a policy of the forum issuing the injunction." *Seattle Totems*, 652 F.2d at 855, *see also In re Unterweser Reederei GmBH*, 428 F.2d at 896. Gallo contends that an anti-suit injunction is necessary to preserve the United States policy encouraging enforcement of forum selection clauses. Although the district court held that the forum selection clause was valid and enforceable, it also held that the policy of enforcement was not "so compelling as to justify the encroachment of one court on the jurisdiction of the other."

Forum selection clauses gained widespread acceptance as a result of the Supreme Court decision in *M/S Bremen*, which was the Court's review of *In re Unterweser*. There, the parties had entered into an agreement to tow a drilling rig from Louisiana to Italy. 407 U.S. at 3. The contract had a forum selection clause in favor of London. After the rig was heavily damaged in the Gulf of Mexico, Zapata brought suit in Florida. Unterweser simultaneously brought suit in London, as was mandated by the contract. *Id*. at 4. The district court in Florida refused to enforce the forum selection clause and entered a preliminary injunction barring Unterweser from pursuing the London litigation. *Id*. at 5. The Fifth Circuit affirmed. The Supreme Court reversed, holding that the forum selection clause should have been enforced:

> There are compelling reasons why a freely negotiated private international agreement, unaffected by

fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect. . . . Manifestly much uncertainty and possibly great inconvenience to both parties could arise if a suit could be maintained in any jurisdiction in which an accident might occur or if jurisdiction were left to any place where the Bremen . . . might happen to be found. The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting.

*Id.* at 12-14 (footnotes omitted). The Court continued: "[I]n the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside." *Id.* at 15.

**[9]** The Supreme Court reaffirmed its commitment to the enforcement of forum selection clauses in *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991). "[A] clause establishing *ex ante* the forum for dispute resolution has the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended . . . ." *Id.* at 593-94. It is therefore clear that the Supreme Court has established a strong policy in favor of the enforcement of forum selection clauses.

**[10]** Forum selection clauses are increasingly used in international business. When included in freely negotiated commercial contracts, they enhance certainty, allow parties to choose the regulation of their contract, and enable transaction costs to be reflected accurately in the transaction price. *See Carnival Cruise Lines*, 499 U.S. at 593-94 (detailing economic advantages of forum selection clauses). We have also repeatedly stressed the importance of forum selection clauses and have held that they "should be enforced absent strong reasons to set them aside." *Northrop Corp. v. Triad Int'l Mktg,*

*S.A.*, 811 F.2d 1265, 1270 (9th Cir. 1987). Without an anti-suit injunction in this case, the forum selection clause effectively becomes a nullity. The potential implications for international commerce are considerable.

In England, anti-suit injunctions are routinely granted in cases of violation of a forum selection clause. While the English decisions do not bind us, we may view them as instructive in cases involving equity jurisdiction.

> Substantially . . . the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789. The substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief are not altered by Rule 65 and depend on traditional principles of equity jurisdiction.

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999) (internal quotation marks, punctuation, and citations omitted).

In *Donohue v. Armco Inc.*, [2002] 1 Lloyd's Rep. 425, 432-33 (H.L.), the House of Lords granted an anti-suit injunction where parties filed suit in New York in contravention of a forum selection clause in favor of England. "[T]he general rule is clear: where parties have bound themselves by an exclusive jurisdiction clause effect should ordinarily be given to that obligation in the absence of strong reasons for departing from it." *Id.* at 433. Similarly, in *Continental Bank v. Aeakos Compania Noviera SA*, [1994] 1 Lloyd's Rep. 505, 512 (Eng. C.A.), the English Court of Appeal upheld an anti-suit injunction:

> In our view the decisive matter is that the bank applied for the injunction to restrain the defendants'

> clear breach of contract. In the circumstances, a claim for damages for breach of contract would be a relatively ineffective remedy . . . . [T]his is the paradigm case for the grant of an injunction restraining a party from acting in breach of an exclusive jurisdiction agreement.

*Id.* The court also stated that the continuation of foreign proceedings "amounts to vexatious and oppressive conduct on the part of the defendants." *Id.*

**[11]** While apparently no other circuit court has decided on the propriety of an anti-suit injunction where proceedings breach a forum selection clause, the Second Circuit has affirmed an anti-suit injunction where foreign proceedings breached an arbitration clause. *See Paramedics*, 369 F.3d at 653-55. The Supreme Court has observed that arbitration clauses, like forum selection and choice of law clauses, can specify "in advance the forum in which disputes shall be litigated and the law to be applied" and that this function is "indispensable" to the "achievement of the orderliness and predictability essential to any business transaction." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974). Protecting contractual devices that provide such indispensable, essential functions within international trade justifies the imposition of an anti-suit injunction.

We have great difficulty with the district court's solution that Gallo's proper remedy to enforce the forum selection clause was to "petition to the court where the action was brought for change of venue." This proposal was both erroneous and perplexing, as it is a legal impossibility to transfer venue from an Ecuadorian court to a California court.

**[12]** In summary, Andina has not given any reason to set aside the forum selection clause. An anti-suit injunction is the only way Gallo can effectively enforce the forum selection clause. In addition, Andina's potentially fraudulent conduct

and procedural machinations in Ecuador tilt the balance even further in favor of granting the injunction. We hold that Andina's pursuit of litigation in Ecuador, in violation of the forum selection clause, frustrates a policy of the United States courts and may well be vexatious and oppressive.

**E**

**[13]** This clear line of reasoning did not persuade the district court to enter a preliminary anti-suit injunction. Why? Because the district court concluded it was trumped by the doctrine of comity. Comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). It "is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Id.* at 163-64.

Although Andina's pursuit of litigation in Ecuador frustrates a policy of the United States, we still need to decide whether the impact on comity would be tolerable. The district court held that comity barred the anti-suit injunction and that "the principle of comity looms larger in this case than in the Fifth and Ninth Circuit cases that have place[d] relatively little emphasis on the principle." Since we have not held that the *Seattle Totems* factors are anything other than illustrative, it is appropriate for courts within the Ninth Circuit to weigh other factors that bear on the issue of comity. However, neither the district court nor a panel of this court is at liberty to — as the district court's holding seems to imply it did — use the laudable principles within the doctrine of comity to defy the holdings of our court.

The district court emphasized in its analysis that Andina filed its litigation first and Gallo filed its action "several

months later." The district court's factual finding was clearly erroneous. The evidence indicates that Gallo filed suit fewer than six weeks after becoming apprised of the Ecuadorian litigation.

**[14]** That Andina filed first, however, makes no difference as to the propriety of an anti-suit injunction. In a situation like this one, where private parties have previously agreed to litigate their disputes in a certain forum, one party's filing first in a different forum would not implicate comity at all. No public international issue is raised in this case. There is no indication that the government of Ecuador is involved in the litigation. Andina is a private party in a contractual dispute with Gallo, another private party. The case before us deals with enforcing a contract and giving effect to substantive rights. This in no way breaches norms of comity. Under the reasoning of the district court, any party seeking to evade the enforcement of an otherwise-valid forum selection clause need only rush to another forum and file suit. Not only would this approach vitiate United States policy favoring the enforcement of forum selection clauses, but it could also have serious deleterious effects for international comity.

We also are puzzled by the district court's holding that "the Ecuadorian court is more competent to decide the key issue; that is, whether the provisions of Decree No. 1038-A apply or not." As stated above, the contract clearly contains a California choice-of-law clause; thus, the validity of the forum selection clause should be decided by California law, as the law of the contract, rather than by Ecuadorian law. *Cf. Batchelder v. Kawamoto*, 147 F.3d 915, 919-920 (9th Cir. 1998). Additionally, to the degree Ecuadorian law is applicable, the district court is capable of applying it. *See* Fed. R. Civ. P. 44(1).

One of the seminal cases on anti-suit injunctions, *Laker Airways Ltd. v. Sabena Belgian World Airlines*, 731 F.2d 909 (D.C. Cir. 1984), provides a detailed analysis of comity. Laker filed an antitrust action in the United States against sev-

eral defendants, including domestic, British, and other foreign airlines. The defendants filed suit in the United Kingdom seeking an anti-suit injunction barring Laker from proceeding with its action in the United States. Meanwhile, the district court granted Laker an injunction barring the defendants from proceeding in the United Kingdom. The D.C. Circuit upheld the importance of comity, stating that "comity serves our international system like the mortar which cements together a brick house." *Id.* at 937. However, the D.C. Circuit affirmed the district court:

> "Comity" summarizes in a brief word a complex and elusive concept—the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum. . . . However, there are limitations to the application of comity. When the foreign act is inherently inconsistent with the policies underlying comity, domestic recognition could tend either to legitimize the aberration or to encourage retaliation, undercutting the realization of the goals served by comity. No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum. Thus, from the earliest times, authorities have recognized that the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act.

*Id*.

There may be different views among circuits as to the relative importance to be given to comity in deciding whether to file an anti-suit injunction. *Compare Quaak*, 361 F.3d at 17 ("We deem international comity an important integer in the decisional calculus"), *and Laker Airways*, 731 F.2d at 927 (anti-suit injunctions should be granted "only in the most compelling circumstances")*, with Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 627 (5th Cir. 1996) ("We decline . . . to

require a district court to genuflect before a vague and omnipotent notion of comity every time that it must decide whether to enjoin a foreign action").

**[15]** We express no opinion on these possible differences. We believe that, in this case, an anti-suit injunction would be appropriate under any test. *See Quaak*, 361 F.3d at 20 ("Where, as here, a party institutes a foreign action in a blatant attempt to evade the rightful authority of the forum court, the need for an antisuit injunction crests"); *Laker Airways*, 731 F.2d at 927 (courts "have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants. Thus, when the action of a litigant in another forum threatens to paralyze the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing an [anti-suit] injunction").

## III

**[16]** Andina has involved Gallo in messy, protracted, and potentially fraudulent litigation in Ecuador in direct contravention of a valid and enforceable forum selection clause. This is a paradigmatic case for a preliminary anti-suit injunction. The district court erroneously applied the law and, therefore, abused its discretion in denying the requested injunction. We reverse and remand to the district court with instructions to enter a preliminary injunction barring Andina from proceeding with litigation in Ecuador.

In lieu of issuing the mandate forthwith, we will consider Andina's conduct between the filing date of this opinion and the date the preliminary injunction is entered in determining whether to impose sanctions under our inherent authority. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-46, 50 (1991).

**REVERSED.**