**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0063n.06

Case Nos. 17-6530/6531

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Feb 07, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| BEIJING FITO MEDICAL COMPANY, LTD., | ) | |
| | ) | |
| Plaintiff-Appellant / Cross-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| WRIGHT MEDICAL TECHNOLOGY, INC., | ) | TENNESSEE |
| | ) | |
| Defendant-Appellee / Cross-Appellant. | ) | **OPINION** |
| | ) | |

BEFORE: THAPAR, BUSH, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. In this case, we consider whether Wright Medical Technology ("Wright") breached its distribution agreement with Beijing Fito Medical Company ("Fito"), which covered Fito's distribution of Wright's medical device products throughout China. Much of this dispute turns on whether Wright's removal of three products from the agreement breaches the implied covenant of good faith and fair dealing under Tennessee law. We conclude, as a matter of law, that it does not. Because the contract gave Wright broad discretion to remove products—and because Wright did not act in bad faith when it did so—Wright did not breach the implied covenant of good faith and fair dealing. Accordingly, we affirm the district court's grant of summary judgment on Fito's claims. We also hold that the district court properly exercised its discretion when it issued an anti-suit injunction to enjoin a substantially similar lawsuit that Fito filed in a Chinese court. We AFFIRM.

## I.

## A.

Tennessee-based Wright manufactures medical devices, and Fito, a Chinese company, distributes medical devices throughout China. In October 2012, Wright and Fito executed a three-year contract, under which Fito agreed to serve as Wright's exclusive distributor of hip, knee, foot, ankle, and biologics products in twenty Chinese provinces. The arrangement was straightforward: Fito would purchase products from Wright and then resell them under its own name to purchasers in its distribution network.

Several provisions in the contract gave Wright the ability to modify its relationship with Fito. First, Wright could terminate the contract outright, but only if one of these four events occurred: (1) Fito failed to perform its obligations under the contract; (2) Fito failed to meet its minimum sales requirement; (3) Fito dissolved, ceased commercial activity, or underwent judicial reorganization or bankruptcy; or (4) a competitor acquired Fito. Second, Wright could remove individual products from the contract as long as Wright gave Fito 90 days' notice. Third, Wright could assign any part or all of the contract to a third party.

In May 2013, less than five months after the contract took effect, Wright entered into a different contract with Shanghai CIIC, making CIIC its exclusive "logistics distributor" of foot, ankle, and biologics products in China. Around the same time, Wright sold Fito more than $920,000 in foot, ankle, and biologics products and more than $270,000 in hip and knee products.

Wright announced plans to sell its hip and knee business to MicroPort Orthopedics, another Tennessee-based medical device manufacturer in June 2013. Under that agreement, Wright transferred many of its distribution contracts to MicroPort, including its contract with Fito. This created a problem: the original contract gave Fito the right to distribute hip and knee products—

as well as foot, ankle, and biologics products. But MicroPort had no interest in distributing Wright's foot, ankle, and biologics products. Thus, Wright informed Fito in an August 29, 2013, letter that it planned to delete the foot, ankle, and biologics products from the contract before completing the MicroPort transaction. In the same letter, Wright proposed a new contract covering the foot, ankle, and biologics products. Fito alleges—and Wright does not contest—that the proposed contract would have required it to purchase more of the foot, ankle, and biologics products than under the old contract. Fito never agreed to the proposed contract, nor did it make a counterproposal, and on May 16, 2014, Wright wrote Fito to revoke its proposal.

Wright insists that Fito lost the right to distribute the foot, ankle, and biologics products on November 27, 2013, 90 days after it informed Fito that it was deleting those products. And Wright contends that its contractual relationship with Fito ended altogether on January 9, 2014—the day that Wright completed the sale of its hip and knee business to MicroPort. But Fito alleges that sometime in late 2013, Wright began to contact its customers and falsely claim that Fito could no longer sell Wright's products. And neither party disputes that Wright contacted Fito's Chinese customers through an August 13, 2014, letter, which informed them that Fito no longer had the right to distribute Wright's foot, ankle, and biologics products.

**B.**

Under the contract's forum selection clause, Fito filed this action in the Western District of Tennessee in April 2015, alleging that Wright breached the contract and tortiously interfered with its business relationships. Wright responded with counterclaims that Fito also breached the contract by using Wright's name and distributing Wright's products after the contract had ended and by using Wright's confidential information to manufacture and distribute copies of Wright's products. Wright also alleges that Fito tortiously interfered with Wright's business relationships

when it contacted Wright's customers and informed them that Wright breached the contract and defrauded Fito. Separately, Wright pleads three breach of contract claims in the alternative, all related to Fito's use of Wright's proprietary information after the contract ended. Wright agrees to pursue its alternatively pleaded claims only if this court determines that its contractual relationship with Fito remained in effect after January 9, 2014—that is, the date that Wright completed the sale of its hip and knee business to MicroPort.

Wright moved for summary judgment on Fito's breach of contract and tortious interference claims, and in June 2017, the district court granted that motion. Because the district court determined that Wright and Fito's contractual relationship ended on January 9, 2014, it did not reach Wright's alternatively pleaded claims. Finally, in November 2017, the district court granted Fito's summary judgment motion and dismissed Wright's remaining claims for breach of contract and tortious interference. Wright asks this court to reverse that judgment only if we reverse the court's grant of summary judgment on Fito's breach of contract and tortious interference claims.

While the Tennessee litigation was ongoing, Fito filed a parallel lawsuit against Wright in January 2017 in the Beijing Huairou District People's Court of the People's Republic of China. Fito's claims in the Chinese litigation are substantially similar to its claims in the Tennessee litigation: Fito alleges that Wright breached the contract by terminating the distribution agreement without cause and by entering into an exclusive distribution agreement with Shanghai CIIC. And Fito alleges that Wright falsely represented to Fito's customers that the distribution agreement was no longer in effect. Wright did not learn about the Chinese litigation until it received service on August 22, 2017, two months after the district court granted its summary judgment motion.[1]

---

[1] Fito's counsel in the Chinese litigation said in a sworn statement that the Chinese court denied Fito's request to serve Wright by courier, thus requiring Fito to serve Wright in accordance with the Hague Service Convention. Fito's counsel insisted that the delay in serving Wright "was not

Shortly after being served, Wright filed a motion for an anti-suit injunction in the Western District of Tennessee to enjoin the Chinese litigation, and the district court granted that motion in November 2017.

## II.

We review de novo an order granting summary judgment. *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018). This court must take the evidence in the light most favorable to the nonmoving party and ask whether there is any "genuine dispute as to any material fact" that requires submission to a jury. Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only when there is no genuine issue of material fact 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## A.

The center of this dispute involves section 3.3 of the contract between Fito and Wright, which addresses Wright's ability to remove products available for distribution:

> [Wright] may, after having given ninety (90) days prior notice to [Fito], delete any of the Products, provided that the orders received and accepted before the effective date of such notice shall be filled and provided further that if [Fito] within sixty (60) days of receipt of such notice provides [Wright] with documentary evidence of any invitation for tender for such Products for which [Fito] has already submitted its bid, then [Wright] will undertake to continue to supply such Products directly only nine (9) months after the date of such original notice.

(R. 26-1, Contract ¶ 3.3.) This section gives Wright significant discretion to delete products from the distribution contract. It imposes no express limits on Wright's ability to delete products, and a plain reading would suggest that Wright could delete any product for any reason. But Fito

___

the result of any intentional act by Fito; rather, it was the result of the complicated and lengthy process of obtaining service of process through the Hague Convention." (R. 351-1, Decl. of Qing Li.)

contends that Wright's discretion is not boundless. Indeed, Fito argues that both the contract's construction and the implied covenant of good faith and fair dealing cabin Wright's discretion to delete products from the distribution agreement—and that Wright breached the contract when it deleted the foot, ankle, and biologics products to complete the MicroPort transaction. We consider each argument in turn.

Under Tennessee law, courts must construe all contractual terms harmoniously "to give effect to all provisions and to avoid creating internal conflicts." *D&E Constr. Co., Inc. v. Robert J. Denley Co.*, 38 S.W.3d 513, 518–19 (Tenn. 2001) (quoting *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996)). Thus, an individual provision "must be interpreted in the context of the entire contract." *Id.* at 519. Given that principle, we must read section 3.3 in conjunction with the entire contract, including section 11.2, which identifies four discrete conditions that justify early termination of the contract. Reading those two sections together necessarily cabins Wright's discretion to delete products under section 3.3. If Wright could delete *all* of the products through section 3.3 without cause, then that section would serve as an alternative termination clause, rendering section 11.2 superfluous. But when we construe a contract, we must avoid "giv[ing] effect to one provision while rendering another provision superfluous or without meaning." *Stonebridge Life Ins. Co. v. Horne*, 2012 WL 5870386, at \*6 (Tenn. Ct. App. Nov. 21, 2012) (quoting 16 *Williston on Contracts* § 49:14 (4th ed.)). Thus, we conclude that Wright could not delete *all* products from the distribution agreement under section 3.3.

That conclusion squares with one of our earlier decisions, *Karl Wendt Farm Equipment Co. v. International Harvester Co.*, in which we interpreted a similar contract between a manufacturer and dealer of farm products. 931 F.2d 1112 (6th Cir. 1991). That contract, a distribution agreement, referenced a list of products that the parties agreed to distribute; it also

gave the manufacturer the right to add and delete products from the list. *Id.* at 1120. After a slowdown in the farm equipment market, the manufacturer sold its farm products business to a third-party, which declined to pursue a distribution relationship with the dealer. When the dealer sued the manufacturer for breach of contract, the manufacturer raised frustration of purpose as an affirmative defense and claimed that the contract authorized it to withdraw completely from the farm equipment market. *Id.* at 1120. The manufacturer argued that because it could delete individual products from the distribution agreement, it could delete *all* products from the distribution agreement and effectively exit the market altogether. We rejected the manufacturer's argument, explaining that it would be "quite a stretch to believe that the parties intended this provision to function as an alternative means for termination of the contract." *Id.* at 1120–21. Instead, we embraced the district court's conclusion that the manufacturer could "eliminate or change certain products or product lines, but not [] eliminate its farm products altogether." *Id.* at 1120.

Thus, Wright could not have deleted all products from the contract under section 3.3. But because Wright deleted only the foot, ankle, and biologics products—leaving the hip and knee products in place—it did not breach the contract by circumventing section 11.2's termination provision. Still, we must determine whether the implied covenant of good faith and fair dealing limits Wright's ability to delete some—but not all—products from the distribution agreement.

In Tennessee, every contract contains an implied covenant of good faith and fair dealing in its performance and its enforcement. *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013) (collecting cases). This rule is not inviolable. Parties may contract around the implied covenant with express language that establishes a different standard of performance, such as one giving a party "sole, absolute, unfettered discretion" over certain

matters. *Id.* at 669; *see also Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996). But unless the parties expressly disclaim the implied covenant, the covenant governs their performance. *Dick Broad.*, 395 S.W.3d at 669. Because section 3.3 is silent on this matter, the implied covenant governs the parties' performance.

Under Tennessee law, there is no standalone claim for breach of the implied covenant—it does not form an independent basis for relief. *See, e.g.*, *Berry v. Mortg. Elec. Registration Sys.*, 2013 WL 5634472, at *7 (Tenn. Ct. App. Oct. 15, 2013). Instead, a party contending that there has been a breach of the implied covenant of good faith and fair dealing must connect that contention to a claim for breach of a specific contractual provision. A breach of the implied covenant "may be an element or circumstance" of a breach of contract, but a party alleging a breach must identify a provision of the contract that the other party has breached. *Solomon v. First Am. Nat. Bank of Nashville*, 774 S.W.2d 935, 945 (Tenn. Ct. App. 1989). Here, Fito succeeds where few plaintiffs do: its properly pleaded claim identifies a provision of the contract, section 3.3, that Wright allegedly breached. The question is whether Wright's deletion of the foot, ankle, and biologics products violated the implied covenant and thereby breached section 3.3.

Wright restates the principle that a party cannot breach the implied covenant of good faith and fair dealing when it performs as specifically allowed under the contract. *See, e.g.*, *Maverick Grp. Mktg., Inc. v. Worx Envtl. Prods. Ltd.*, 2015 WL 8335153, at *7 (W.D. Tenn. Dec. 8, 2015) (internal quotations omitted), *aff'd*, 659 F. App'x 301 (6th Cir. 2016). And Wright argues that section 3.3 specifically allows it to delete products from the distribution agreement, which forecloses any claim that it breached the implied covenant. But if we read that principle too broadly, it would swallow the competing rule that the implied covenant applies to all contracts unless the parties expressly disclaim the covenant.

*Dick Broadcasting* reveals this tension. In that case, the Tennessee Supreme Court held that there was a genuine factual dispute on whether one party breached the implied covenant by withholding its consent to the assignment of a right-of-first-refusal agreement. *Dick Broad.*, 395 S.W.3d at 672. The contract in that case granted Dick Broadcasting Company the right-of-first-refusal to purchase Oak Ridge FM's radio station assets. *Id.* at 656. Dick Broadcasting could assign that right to a third party, provided it received Oak Ridge's prior written consent. *Id.* at 657. The contract imposed no conditions on Oak Ridge's ability to refuse consent. When Dick Broadcasting entered into a purchase agreement to sell its assets, including the right-of-first-refusal, Oak Ridge refused to consent to the sale. *Id.* at 658. Oak Ridge's president later acknowledged that, on the advice of his counsel, he "refused to agree to the assignment without additional consideration" and hoped to broker a "separate and more profitable agreement" with the purchaser of Dick Broadcasting's assets. *Id.* Although Oak Ridge acted as specifically allowed by the contract when it refused its consent, the Tennessee Supreme Court held that the implied covenant "requires a party to act with good faith and in a commercially reasonable manner in refusing consent to assign the agreement" and thus vacated the trial court's grant of summary judgment to Oak Ridge. *Id.* at 672. *Dick Broadcasting* therefore makes clear that a party may breach the implied covenant of good faith and fair dealing—and therefore breach a contract—even when it exercises discretion that the contract confers.

Whether a party has breached the implied covenant can be fact-specific, and courts often defer resolving that question to the jury. *Id.* at 671. But courts have a role to play, too. Indeed, determining "what is required by the duty of good faith in a given case turns on an interpretation of the contract at issue." *Lamar Advert. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009). When interpreting the contract, the court must "look to the language of the instrument

9

and to the intention of the parties, and impose a construction which is fair and reasonable." *Id.*; *see also Wallace*, 938 S.W.2d at 686.[2]

Here, the contract expressly contemplates the possibility that Wright could sell some or all of its assets to a third party. Section 14.3 states that Wright "may freely assign any or part of its rights and obligations" under the contract. (R. 26-1, Contract ¶ 14.3.) And of course, the contract gives Wright the discretion to delete products from the distribution agreement. When the parties signed the contract, they could have reasonably expected that Wright might sell part of its business to a third party. Less likely—but still conceivable—was the possibility that Wright might delete some products under section 3.3 to prepare for such a sale. Fito argues that section 3.3 allows Wright to delete products only for supply chain-related issues, such as Chinese import restrictions or product discontinuations. But the contract contains no language limiting the deletion of products to those scenarios, and we see no reason why supply chain-related issues were any more foreseeable than the possibility that Wright might sell its business to a third party.

Wright's conduct may strike some as aggressive. But sophisticated parties such as Wright and Fito "pursue their own self-interest and understand and expect that the parties with whom they are dealing are doing likewise." *SecurAmerica Bus. Credit v. Schledwitz*, 2014 WL 1266121, at *29 (Tenn. Ct. App. Mar. 28, 2014) (quoting *Dick Broad.*, 395 S.W.3d at 674 (Koch, J., concurring)). When it was negotiating the contract, Fito could have insisted on language that limited Wright's discretion to delete products under section 3.3. And if it did not succeed, Fito could have declined to execute the contract. But Fito cannot rely on the implied covenant to "avoid or alter the terms of an agreement," *Jackson v. CitiMortgage*, 2017 WL 2365007, at *9 (Tenn. Ct.

---

[2] The Tennessee Supreme Court has suggested that a court must look to the "objectively reasonable expectations of parties," rather than the parties' subjective intent, when evaluating the claim. *Wallace*, 938 S.W.2d at 687 (quoting *Tolbert v. First Nat'l Bank*, 823 P.2d 965, 970 (Or. 1991)).

App. May 31, 2017), and we will not read new conditions into a contract that the two sophisticated parties willingly brokered, simply because Fito has come to regret not bargaining harder.

Relatedly, we note that commercially reasonable, self-interested business tactics do not, by themselves, breach the implied covenant of good faith and fair dealing. Tennessee courts readily acknowledge that the duty of good faith and fair dealing is not "specifically defined." *SecurAmerica*, 2014 WL 1266121, at *26. And the majority opinion in *Dick Broadcasting* does not address the scope of the implied covenant, prompting Justice Koch's separate concurrence to "address this important point." *Dick Broad.*, 395 S.W.3d at 673 (Koch, J., concurring). That concurrence cautions against a broad definition of good faith that undermines parties' freedom to contract and instead suggests a narrower definition: the absence of bad faith. *Id.* at 674. Bad faith is "not simply bad judgment or negligence." *Id.* at 675 (internal citations omitted). Rather, bad faith "involves a dishonest purpose" and may include fraud, deceit, or the refusal to fulfill a contractual obligation. *Id.* (internal citations omitted); *see also SecurAmerica*, 2014 WL 1266121, at *29.

Fito has not advanced sufficient evidence to suggest that Wright's conduct rises to the level of bad faith. We can trace the origin of the parties' conflict to one event: Wright's agreement to sell its hip and knee business, including its contract with Fito, to MicroPort. There is no dispute that the distribution agreement permitted Wright's transaction with MicroPort.[3] To prepare for this transaction, Wright deleted the foot, ankle, and biologics products from the contract. The record contains no evidence that Wright sold its hip and knee business as pretext for deleting the foot, ankle, and biologics products or for harming Fito's business.

---

[3] We note that the parties expressly disclaimed the implied covenant of good faith and fair dealing in section 14.3, giving Wright the "sole discretion" to sell any or part of its rights and obligations under the distribution agreement. (R. 26-1, Contract ¶ 14.3.)

To be sure, Wright sold Fito more than $900,000 in foot, ankle, and biologics products less than four months before Wright told Fito that it was deleting those same products from the distribution agreement. Nonetheless, we underscore the absence of any evidence suggesting that Wright made this sale in bad faith. The record suggests that Wright was eager to meet internal goals in the Asian market and thus "push[ed] hard" to close transactions with multiple distributors, including Fito. (R. 222-5, Email.) To do so, Wright offered Fito a discount on the sale by providing $1.4 million in inventory—for which Fito paid less than $1.2 million. Fito may have come to regret placing such a large order, and indeed, Fito executive Wayne Yue described the purchase as a "mistake" and a "wrong decision that I had made." (R. 263-1, Dep. of Wayne Yue at 106:24–107:4.) But just because one party regrets making a transaction does not mean that the other party to the transaction acted in bad faith. We also note that Wright proposed a new contract, covering the same three deleted products, after it announced it was selling its hip and knee business. True, the proposed contract would have required Fito to purchase more of the foot, ankle, and biologics products than under the old contract. Wright's proposal might have been be hard-nosed, but it was far from fraudulent, deceitful, or dishonest, nor does Fito contend that it ever sought to negotiate more favorable terms to the proposed contract. The mere presentation of a proposed contract—which itself is an invitation to negotiate—does not amount to bad faith. Without evidence of bad faith, Fito's claim for breach of the implied covenant of good faith and fair dealing cannot survive summary judgment.

We conclude that Wright did not breach the implied covenant of good faith and fair dealing and affirm the district court's grant of summary judgment on this claim.

**B.**

Fito raises a separate but related breach of contract claim regarding Wright's deletion of the foot, ankle, and biologics products under section 3.3. Fito argues that while Wright may delete a product under section 3.3 and then cease selling that product to Fito, Wright cannot compel Fito to stop selling or distributing a deleted product. As Fito notes, some clauses in the contract make clear when Fito must cease distributing and promoting Wright products. Section 12, for example, says that if the parties do not renew their agreement or if one party triggers a termination condition, Fito "must cease promoting and reselling the Products as from the effective date of termination or expiry of the Contract . . . ." (R. 26-1, Contract ¶ 12.1.) And section 2.4 allows Wright to "delete specific areas within a Territory or delete exclusivity rights granted to areas within a Territory" if Fito fails to meet its sales quotas. (*Id.* at ¶ 2.4.) By contrast, section 3.3 does not address Fito's exclusive rights to promote, distribute, and resell deleted products. Fito asks this court to infer that section 3.3 only affects Fito's ability *to purchase* products from Wright—but does not affect Fito's ability *to distribute* deleted products Fito had already purchased.

The plain language of the contract does not support Fito's argument. When read together with the rest of section 3, section 3.3 prevents Fito from distributing deleted products (with the exception of orders placed before the product was deleted). Section 3.1 states that Fito's "exclusive right of distribution is granted for the 'Products' listed in Exhibit 1 to the Contract" and that Fito "may not promote or distribute other products of Wright unless authorization to do so is granted in writing by Wright." (*Id.* at ¶ 3.1.) In essence, section 3.1 gives Fito the right to promote and distribute *only* the products listed in Exhibit 1 of the contract—*i.e.*, hip, knee, ankle, foot, and biologics products—unless Wright says otherwise. And section 3.3 allows Wright to delete products from the Contract, effectively striking those products from Exhibit 1. Because Fito

cannot promote or distribute products not listed in Exhibit 1—and because section 3.3 allows Wright to delete products from Exhibit 1—Fito cannot promote or distribute products that Wright has deleted under section 3.3, unless Wright gives written authorization to the contrary.

Relatedly, Fito argues that Wright breached section 11.2, the contract's termination clause, when it deleted the foot, ankle, and biologics products from the distribution agreement and divested Fito of the right to distribute those products. According to Fito, section 11.2 prevents Wright from divesting Fito of its distribution rights unless either party triggers one of four conditions justifying early termination of the contract. The record contains no evidence that either party triggered any condition, yet Fito nonetheless lost its right to distribute the foot, ankle, and biologics products. Fito's argument, however, is unavailing. Section 11.2 outlines the grounds for a *complete termination* of the contract. But Wright never terminated the contract with Fito. Wright deleted the foot, ankle, and biologics products from the contract—thus divesting Fito of its ability to distribute those products—but it *transferred* its hip and knee business to MicroPort. All along, Fito retained the right to distribute hip and knee products, either on behalf of Wright or MicroPort. Because Wright never fully terminated the contract, Fito's argument fails.

As a result, we affirm the district court's interpretation of section 3.3 and conclude that Fito lost its right to distribute the foot, ankle, and biologics products after Wright deleted those products from the distribution agreement. And we hold that Wright did not breach section 11.2 of the contract when it divested Fito of its right to distribute the foot, ankle, and biologics products.

**C.**

Next, we consider whether Wright breached section 2.1 of the contract, which gives Fito exclusive distribution rights in twenty Chinese provinces. Fito's argument is straightforward: so long as it remained Wright's exclusive distributor, Wright could not appoint anyone else to

distribute its products in the same territory. Fito alleges that Wright did exactly that when it entered into a "Logistic Distributorship Agreement" with Shanghai CIIC on May 8, 2013. That agreement named CIIC as Wright's "select, Exclusive, independent logistics distributor," and covered the same foot, ankle, and biologics products—and some of the same Chinese provinces—as Wright's earlier contract with Fito. Wright, by contrast, contends that the agreement was a matter of logistical convenience, with CIIC merely acting as the entity from which Fito purchased Wright's products. And Wright claims that the contract allows this kind of agreement. Indeed, section 2.2 states that Fito "shall purchase the Products exclusively from [Wright] or from entities as directed by [Wright], which may be communicated to it at any time by [Wright]." (*Id.* at ¶ 2.2.)

Setting aside the nature and purpose of Wright's agreement with CIIC, we must first determine when Fito lost the right to distribute Wright's foot, ankle, and biologics products. Under section 3.3, Wright had to give Fito 90 days' notice that it was deleting a product from the distribution agreement. Wright essentially did so with its August 29, 2013, letter, which informed Fito of the asset sale to MicroPort and the impending deletion of the foot, ankle, and biologics products from the contract.[4] Thus, Fito retained the exclusive right to distribute Wright's foot, ankle, and biologics products for 90 days after receiving Wright's letter—that is, until November 27, 2013. Fito offers no evidence to suggest that CIIC distributed Wright's products before that date. To be sure, the record contains evidence that CIIC sold foot, ankle, and biologics products to Fito's customers in 2014 and 2015, but that does not help Fito's case. By 2014, Fito no longer had any right—let alone the exclusive right—to distribute Wright's products. Because Fito cannot

---

[4] We note that although the August 29, 2013, letter purports to immediately delete the foot, ankle, and biologics products from the distribution agreement, Wright could not delete any product under section 3.3 without giving Fito 90 days' notice. Thus, the deletion was not effective until November 27, 2013. Fito has never challenged the adequacy of this notice.

show that it suffered any damages, its breach of contract claim necessarily fails. *See, e.g.*, *Haynes v. Bass*, 2016 WL 3351365, at *6 (Tenn. Ct. App. June 9, 2016) ("[F]or a claim for breach of contract, a plaintiff must prove damages caused by the breach of the contract.") (citation omitted).

Separately, Fito argues that Wright breached the implied covenant of good faith and fair dealing, simply by executing the agreement with CIIC while the contract with Fito was still in effect. But this claim suffers from the same flaw as Fito's breach of contract claim: Fito cannot show that it suffered damages from the mere existence of Wright's agreement with CIIC. *See id.*

For these reasons, we affirm the district court's grant of summary judgment on this breach of contract claim.

**D.**

In addition to its breach of contract claims, Fito brings a claim for tortious interference with business relations. To prevail, Fito must show:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means* . . . and finally, (5) damages resulting from the tortious interference."

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). Fito alleges that twice, Wright contacted Fito's customers to discourage them from purchasing Wright's products from Fito. We consider each communication in turn.

Fito first alleges that Wright told Fito's customers in "late 2013" that Fito "ha[s] a problem with Wright on our contract," and that Fito was no longer authorized to sell Wright's products. (R. 223-3, Dep. of Yu Tian & Nannan Liu at 221:12–222:2.) But Fito retained the right to distribute Wright's foot, ankle, and biologics products until November 27, 2013, and Wright's hip

and knee products until January 9, 2014. Nonetheless, this allegation—by itself—is not enough to survive summary judgment. Fito has not identified who at Wright made such representations or which of Fito's customers heard such representations, nor has Fito specified when in "late 2013" the representations occurred. At summary judgment, we must construe the evidence in the light most favorable to the nonmoving party, but that party—here, Fito—must still "*set forth specific facts* showing there is a genuine issue for trial." *Guarino v. Brookfield Tp. Trustees*, 980 F.2d 399, 405 (6th Cir. 1992) (internal quotations and citation omitted; emphasis in original). Fito has not done so. Moreover, wholly apart from this problem, the testimony Fito offers is hearsay and thus cannot support its tortious interference claim on summary judgment anyway. *See U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997).

Fito points to a separate instance of tortious interference. In an August 13, 2014, letter to Fito's customers, Wright explained that its contract with Fito "has been officially terminated and Fito has not had the right to distribute Wright products under the Distributor contract since November 27, 2013." (R. 26-10, Cooke Letter.) The letter also stated that there was no existing contract between Fito and Wright and that any representations to the contrary were false. Although Fito lost the right to distribute Wright's foot, ankle, and biologics products in November 2013, Fito retained the right to distribute Wright's hip and knee products through January 9, 2014. That discrepancy is immaterial, however: by August 2014, when Wright sent the letter, Fito had lost all rights to sell Wright's products. A party does not act with improper motive or means—a necessary element of tortious interference—when it makes a truthful statement. *See Molloy v. Hrisko*, 2015 WL 4323028, at *11 (Tenn. Ct. App. July 14, 2015) (holding that the statement's truthfulness negated the improper motive or means necessary for intentional interference with business relations claim); Restatement (Second) of Torts § 772 cmt. b (1979) ("There is of course

17

no liability for interference with a contract or with a prospective contractual relation on the part of one who merely gives truthful information to another."). Thus, Fito's second allegation cannot support its claim for tortious interference. For these reasons, we affirm the district court's grant of summary judgment to Wright on Fito's tortious interference claim.

## E.

Because we affirm the district court's grant of summary judgment on Fito's breach of contract and tortious interference claims—and thus hold that Wright is not liable to Fito—we need not address Fito's arguments about the scope of the contract's liability clause. Nor do we address Wright's counterclaims, which it agreed to drop if this court upholds the district court's summary judgment order.

## III.

## A.

Next, we consider whether the district court erred in granting an anti-suit injunction to enjoin Fito's parallel litigation in China. We review that decision for abuse of discretion. *Gau Shan Co. Ltd. v. Bankers Tr. Co.*, 956 F.2d 1349, 1352 (6th Cir. 1992). "A district court abuses its discretion when it relies on clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Id.* (quoting *N.A.A.C.P. v. City of Mansfield*, 866 F.2d 162, 166–67 (6th Cir. 1989)). That standard is deferential: "the district judge's weighing and balancing of the equities should be disturbed on appeal only in the rarest of cases." *Id.* (quoting *N.A.A.C.P.*, 866 F.2d at 166).

The anti-suit injunction is an equitable remedy that allows one court to "control the conduct of persons subject to their jurisdiction to the extent of forbidding them from suing in foreign jurisdictions." *Gau Shan*, 956 F.2d at 1352 (quoting *Laker Airways Ltd. v. Sabena, Belgian World*

*Airlines*, 731 F.2d 909, 926 (D.C. Cir. 1984)). Courts "rarely issue[]" the injunction because that relief contravenes the general principle of allowing parallel proceedings on the same *in personam* claim, "at least until a judgment is reached in one [jurisdiction] which can be pled as res judicata in the other." *Id.* (alteration in original) (quoting *Laker Airways*, 731 F.2d at 926–27). But there are limited circumstances when the need for the injunction outweighs concerns about international comity. In this circuit, which adopts the same standard as the Second and D.C. Circuits, courts may grant an anti-suit injunction to prevent threats to the forum court's jurisdiction or to stop one party from evading an important public policy of the forum court. *Gau Shan*, 956 F.2d at 1355; *see also China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 37 (2d Cir. 1987); *Laker Airways*, 731 F.2d at 931 n.73.

Parallel proceedings rarely threaten a forum court's jurisdiction. In *Gau Shan*, which considered the propriety of an anti-suit injunction that the district court issued before reaching a judgment on the merits of the case, we concluded that only two scenarios might threaten the district court's jurisdiction: (1) when the district court's jurisdictional basis is *in rem* or *quasi in rem*; or (2) when the foreign court attempts to carve out exclusive jurisdiction to divest the district court of all jurisdiction. *Id.* at 1356. Neither situation existed in *Gau Shan*, and neither situation exists here.

Because the Chinese litigation does not threaten the federal court's jurisdiction, the only proper basis for awarding the anti-suit injunction would have been to prevent Fito from evading an important public policy. Wright argues that the district court properly issued the injunction to enforce the contract's forum selection clause.[5] The question on appeal, then, is whether enforcing

---

[5] Section 18.2 of the contract states, "[f]or all litigation which may arise out of the Contract and/or its effects, relating to its validity, interpretation, performance or termination and their effects, the

a forum selection clause is an important enough public policy to warrant an anti-suit injunction. *Gau Shan* tells us that this is a high bar. In that case, the plaintiff filed a complaint in Tennessee asking for rescission of a promissory note. *Id.* at 1352. The plaintiff also sought treble damages for negligence and common law fraud and deceit, as provided by Tennessee statute. *Id.* Because the defendant had threatened to sue the plaintiff over the same promissory note in a Hong Kong court, the plaintiff sought an anti-suit injunction to preemptively enjoin any foreign litigation. The plaintiff argued, in part, that the injunction would prevent the defendant from obtaining a favorable judgment in Hong Kong, which did not provide for treble damages, and then asserting that judgment as res judicata in Tennessee. *Id.* at 1357. The district court granted the anti-suit injunction, but we reversed. Although we recognized Tennessee's policy interest in awarding treble damages, we noted that every Tennessee statute represents an expression of the state's policy goals, and we questioned whether "the public policy of one state could ever outweigh" the principles of international comity that disfavor anti-suit injunctions. *Id.*

While *Gau Shan* involves a state statute, we acknowledged that a party's evasion "of an important *national* policy" might warrant an anti-suit injunction. *Id.* (emphasis added). This court has never addressed whether enforcing a forum selection clause is a sufficiently important national public policy to warrant an anti-suit injunction. But the Supreme Court has recognized a "federal policy favoring enforcement of forum selection clauses," *Wong v. PartyGaming Ltd.*, 589 F.3d 821, 826 (6th Cir. 2009) (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 587, 591 (1991)); *see also M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972), and other circuits have held that an anti-suit injunction is an appropriate remedy to enforce a forum selection clause.

---

Parties grant *exclusive competence* to the United States District Court for the Western District of Tennessee." (R. 26-1, Contract ¶ 18.2) (emphasis added).

The Second Circuit affirmed the district court's decision to issue an anti-suit injunction to protect the validity of a forum selection clause, *Farrell Lines Inc. v. Ceres Terminals Inc.*, 161 F.3d 115 (2d Cir. 1998), where the district court described the parallel litigation as a clear effort to "evade an important public policy." *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 130 (S.D.N.Y. 1997). And the Ninth Circuit has, on multiple occasions, held that a district court may grant an anti-suit injunction on this ground. *See, e.g. Applied Medical Distribution Corp. v. Surgical Co. BV*, 587 F.3d 909, 918–19 (9th Cir. 2009) (reversing district court's denial of anti-suit injunction); *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 991 (9th Cir. 2006) (same).

Given these decisions, which recognize the important national policy interest in enforcing forum selection clauses, we conclude that the district court did not abuse its discretion when it issued the anti-suit injunction.

## IV.

We AFFIRM the district court's grant of summary judgment on Fito's breach of contract and tortious interference claims, as well as the court's entry of an anti-suit injunction to enjoin the Chinese litigation.